[Crim. No. 3154. In Bank.—April 30, 1929.]

THE PEOPLE, Respondent, v. ANTHONY BROWN, etc., et al., Appellants.

J. J. Henderson for Appellant Brown.

Frank L. Murphy for Appellant Stokes.

Walter E. Burke, James H. Gregg and Eugene Crosby, *in pro. per.*

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Neil McAllister, District Attorney, for Respondent.

PRESTON, J.—The defendants and appellants, Anthony Brown, Roy Stokes, Walter E. Burke, James H. Gregg and James Gleason and defendant Albert M. Stewart, convicts in the Folsom penitentiary, were jointly charged and tried for the murder of a fellow convict, George Baker. All the defendants were convicted of murder in the first degree without recommendation. Motions for new trial and in arrest of judgment were made and denied. All the defendants have appealed, but the appeal of defendant Stewart, taken separately, is not yet before us.

This charge grew out of a bold and desperate plan of escape from said prison, a plan which involved the use of force to the extent of taking the life, if necessary, of any person who stood in the way of its accomplishment or who might by accident or for some other reason be within the line of march of the revolt.

On Thanksgiving morning, November 24, 1927, at about 10 o'clock, defendants began the execution of their well-planned scheme of escape, Stokes armed with a gun, afterward carried by Brown, Burke with a hatchet, and the others with razor and knives. They first rounded up some five or six convicts who were trusties, and a guard, and locked them in cell 239 in the back alley of the prison. Thereafter they proceeded to the rotunda and attacked the guard and others in an attempt to gain entrance through

the door leading to the warden's office. Failing in this, they took Guards Neal and Gorahnson, the latter being already wounded by them, and proceeded to the rear of the prison, where there is an inner gate and passageway or tunnel, with counting booth therein, leading to the outer gate, captain's office and the yard.

This passageway is about fifty feet long and about fifteen feet wide; the captain's office is located just west of the outer gate at the north end leading to the yard; said counting booth, about three and a half feet wide by seven feet long and seven feet high, is located at the northeast corner of said passageway and is usually occupied by a convict counter who assists the guard stationed just outside the outer gate in keeping and checking the count of the convicts going in and out thereof. On said morning, during the hour or so prior to said time, deceased, George Baker, was seen by several witnesses in said counting booth. A small stove was lighted inside and, having recently been let out of the hospital and being sensitive to the cold, he had stopped therein to get thoroughly warm, but was not on duty as a counter.

Upon reaching said inner gate located at the south end of said passageway, said escaping convicts, with said guards, ordered them to have the gate opened. As the prisoner on the other side opened the gate, Guard Neal stepped through and attempted to close it after him. Not succeeding, he ran through the passageway, toward the outer or north end, whereupon, in furtherance of the plot to escape, two shots were fired; one hit him and the other is claimed to be the shot which killed said Baker while in said counting booth. Defendant Brown is identified by the witnesses as the convict who carried the gun and fired the two shots. The other defendants were present with weapons aiding and abetting him. There is a conflict in the evidence as to whether the first or second shot hit the deceased. Certain it is that one of the shots passed through a pane of glass in the window of said counting booth and could have hit any person therein within its line of travel.

Guard Neal dragged himself on through the passageway and outer gate to the captain's office. Guard Gorahnson was hit over the head with a hatchet and left lying in the passageway inside said inner gate. The inner gate was closed,

and evidently remained so until early the next morning. Said escaping band, still in mutiny and acting in concert for said deadly purpose, then proceeded to the schoolhouse, where they imprisoned other guards and some fourteen hundred convicts and kept them as prisoners until about 6 or 7 o'clock the next morning, November 25th, when, seeing their plan had failed, they capitulated. There is testimony that the two gates opening upon said passageway were locked immediately after the above incident of the firing of said two shots and remained locked until about 7 o'clock the next morning, at which time the body of decedent Baker was found in said counting booth. We shall now discuss such of the assignments of error urged by appellants as appear important.

The first is the attack upon the sufficiency of the evidence. In our opinion this assignment requires but little consideration. In reality the argument on the evidence is not so much with respect to its alleged insufficiency as to the alleged discrepancies therein and the incredibility of portions thereof. The chief reason for the attack made upon it seems to be to strengthen the other assignments of error. However, the desperate and determined attempt to escape by force of arms is admitted, as is also the participation therein by each of the appellants; the firing of the two shots into the tunnel or passageway by the defendant Brown is also conceded to be shown by the evidence. The presence of the other defendants aiding and abetting his act is also conceded. The wounding of Turnkey Neal by one of the shots is likewise conceded. The finding of the body of the deceased Baker in the counting booth at 7 A. M. on the morning of November 25th is also admitted; that he was killed by a bullet entering just below the left nipple and passing entirely through his body, nicking his heart, is also admitted. A bullet hole in the glass of the counting booth was also found, which could well have been made by the same bullet that hit the deceased, and the same is true of a dent on the outer gate found in the line the bullet could have traveled after piercing the glass and penetrating the body of the deceased. The admitted armed mutiny in which all the defendants were engaged; the admitted firing of the two shots, which all the defendants aided and abetted; the physical evidence on the premises as well as the evidence

upon the body of the deceased furnished itself ample and sufficient evidence that one of the two shots fired by Brown killed Baker.

But, aside from his, there is in the record ample testimony given by eye-witnesses, which the jury was warranted in crediting, to the effect that Brown fired the two shots and that one of them at least hit and killed the deceased, Baker. In fact, Stewart, the sixth defendant in the revolt, testified himself that he saw the convict in the counting booth and saw him go down at the time of the shooting, but could not tell whether he was hit or was hiding to escape danger. In this state of the record it is a useless consumption of time to argue discrepancies in the evidence such as whether shot one or shot two hit Neal or whether shot one or shot two hit the deceased, Baker; as is also true as to whether Neal called upon the convict Taylor to open the gate or whether Taylor opened it himself; or whether Neal, after being wounded, dragged himself alone to the captain's office or was assisted by Guard Thompson; or whether the captain of the guard was at a place where he could see any of the shooting; or whether Thompson was unworthy of belief because, if he saw the deceased fall, he should not have neglected looking after him until 7 A. M. the next day. The defendants' testimony offered no reasonable explanation of any kind of the death of Baker consistent with their innocence, and we are entirely satisfied with the finding of the jury in this behalf.

█ The next assignment is that the acting court reporter was not a qualified court reporter *pro tempore* because he had not been regularly appointed and had not subscribed to an oath of office. We can discover no merit whatsoever in the contention that this situation could have been in anywise prejudicial to the rights of appellants. Franklin·had acted for three and one-half years in the capacity of court reporter ·and was thoroughly competent and faithful in his work. No effort is made to show that his transcript of the proceedings was in any way untrue or incorrect. This is but a collateral attack upon his status as an adjunct or employee of the court. The court reporter is not among the list of county officers under section 4013 of the Political Code. We know of no constitutional or statutory provision which requires a court reporter to be an

indispensable ingredient of a court. The object of having a reporter is to be able to secure an accurate transcript of the proceedings taken in the court. If appellants were enabled to receive and did receive a correct transcript of the proceedings had and taken at their trial, the ends of the law have been satisfied. If, however, they were unable to secure a record upon appeal or suffered any other material injury, we might be inclined to view their contention as having force. But we have here what purports to be and, in fact, what must be a full, true and accurate reproduction in full of all the proceedings had and taken upon the trial.

Even were a reporter given the status of an officer of the court, nevertheless, in view of this collateral attack, we would be required to hold in an instance of this kind that he had had at least the status of a *pro tempore* reporter *de facto*. (*In re Danford*, 157 Cal. 425, 431 [108 Pac. 322]; *People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478].)

Appellants next contend that the trial court unduly restricted the examination of jurors upon their *voir dire*. Scarcely any specific instances are pointed to, but we are enjoined to read the whole transcript upon this subject in order to discern the attitude of the court in this respect. The court himself conducted the examinations, permitting the attorneys to suggest questions, as well as also permitting some of the individual defendants to do so. When a challenge was interposed and denied, the examination of the talesman was taken over by the attorney making the challenge. We have examined the entire transcript of these proceedings, which covers some four hundred pages, and in our opinion the examination of each talesman was full, fair, just and proper, and no substantial right of any kind was denied defendants or any of them. This method of examining jurors has been provided for by the recent statute, section 1078 of the Penal Code (as amended by Stats. 1927, p. 1039), and where fairly conducted has been approved by this court. (*People* v. *Estorga*, 206 Cal. 81 [273 Pac. 575].) Appellants particularly stress the contention that the court permitted Juror Dawson to serve as such in violation of law, in that the record shows that on his *voir dire* he answered "yes" to the following question: "Have you any conscientious opinions which would preclude you from returning a verdict of guilty, where the charge in-

volved the death penalty?" The record shows the following questions and answers preceding this question: "The Court: Q. Mr. Dawson, I take it you have heard the questions we have been asking here all day, more or less? A. Yes, sir. Q. Is there anything in any of those questions which you think would disqualify you, or prevent you from sitting fairly and impartially in the case? A. No, sir." Also the following, among many other questions, were subsequently asked him: "Q. Are you prejudiced in any way against circumstantial evidence? A. No, sir. Q. If you were sworn as a juror in this case, could you try it fairly and impartially to both sides? A. Yes, sir. Q. Have you any preconceived notion or idea which way you would like to have the verdict go, or is your mind open and free? A. No, sir; my mind is open," whereupon at the close of the examination the following occurred: "The Court: Either side any further questions from this gentleman? Hearing none, we will pass on to challenges. Mr. Johnson: We will pass the juror."

Neither the prosecution nor any of the defendants interposed a challenge for cause against this talesman. At the time this examination occurred some seventy-seven proposed jurors had been examined, each of whom had been asked questions in substance the same as the questions above set forth upon the subject of conscientious scruples against capital punishment. Upon the day of the occurrence in question at least four had answered in the affirmative and had been excused. Indeed, the prospective juror who was questioned immediately preceding Mr. Dawson, one Mrs. Bender, answered that she was prejudiced against capital punishment, was challenged for cause by the district attorney and the challenge was allowed by the court. Taking the context of this examination, together with the proceedings preceding it, coupled with the reference thereto by the court in its questions, and supplementing it with the fact that this jury rendered three verdicts as to each of these appellants, to which Juror Dawson assented and signified his assent openly six times when polled by the clerk, we have no hesitancy in concluding that said answer "yes" is a clerical misprision and does not represent the state of mind of said juror but, on the contrary, the answer "no" was intended. It is conceded that neither the district attorney nor the

trial judge would have thought of compelling or permitting a juror to serve who entertained the state of mind referred to in section 1074, subdivision 8, of the Penal Code. Had the juror answered "yes," the prosecution would have immediately interposed a challenge or else the court would on its own motion have excused the talesman for cause. The motive for silence in such a situation existed only upon the part of appellants themselves. This holding renders it unnecessary to pass upon the motion for diminution of record made by the People to correct the record in this particular, and the motion for this reason alone is denied.

The contention that the indictment was based solely upon hearsay evidence is unfounded in fact, and were the assertion true, the law wisely affords no review of such a situation. An indictment is only an accusatory paper, and at most is to be considered as nothing more than part of the method of putting the defendant on trial for the charge made therein. It is not of itself considered as evidence against him upon the trial.

The form of the verdict was proper and the instructions of the court as to fixing the punishment were in harmony with the holding of this court in *People* v. *Hall,* 199 Cal. 451 [249 Pac. 859].

The numerous assignments of error directed at the statements in the argument of the district attorney have been examined, and in view of the facts of the record but little serious objection could be urged to them, but in all cases where the proper bounds were exceeded, the court was prompt in its admonishment, relieving any cause for prejudicial results.

The two pages, consisting merely of page and line references, where alleged errors on the part of the trial judge may be found, we consider not in proper shape for review. However, we have read enough of them to convince us that the criticisms are entirely groundless. In most instances they are comments or questions by the court to which no objection was made.

This cause was heard by the trial judge under trying and at times exasperating conditions, but notwithstanding this fact the record is singularly free from error. The judgment of conviction and order denying motion for a new

trial as to each of the five appellants first hereinabove named, but not as to defendant Albert M. Stewart, is hereby affirmed.

Waste, C. J., Shenk, J., Curtis, J., Langdon, J., Richards, J., and Seawell, J., concurred.

Rehearing denied.