STATE *vs.* JOHN G. MILLER, Alias.

JULY 1, 1932.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

RATHBUN, J.  A grand jury for the counties of Providence and Bristol returned an indictment, charging murder, against John G. Miller, alias "Whitey" Miller, Richard Roe, alias John Doe, and John Roe, alias John Doe.  Defend-

ants Richard Roe and John Roe were not identified by name and were not apprehended. Defendant Miller was tried alone and found guilty of murder in the second degree. The case is here on defendant's exceptions as follows: to the admission and exclusion of evidence; to the refusal to dismiss the indictment; to instructions to the jury; to the refusal to instruct as requested and to the denial of the defendant's motion for a new trial.

On April 19, 1930, the defendant, John G. Miller, was an inmate of the Rhode Island State Prison, serving a sentence of thirty-five years for the crime of robbery. One Thomas "Pretty" McNeil was serving a like term for the crime of burglary. On said date McNeil, assisted by certain confederates, who had entered the prison under the guise of visitors, attempted to make an escape. One of these confederates shot and killed James H. McVay, a prison guard.

It is the contention of the State that Miller conspired with McNeil and the two persons not apprehended to effect an escape and that Miller, being one of the conspirators, is guilty of the murder committed by his fellow conspirators in the furtherance of their unlawful design.

On the afternoon of said date visitors were being received by convicts at the State Prison. The deceased, James H. McVay, for whose death the defendant and said persons not apprehended were indicted, was the officer in charge of the visitors' room, so-called, at the prison. Visitors were permitted to talk with prisoners who were lined up on the opposite side of a wire screen separating the visitors' room from the prisoners' cage, so-called.

Shortly after 2 p. m. on the afternoon in question both Miller and McNeil received visitors, the identity of whom has not been ascertained. McNeil came into the cage from the prison yard, sat in the cage and talked with his visitor. Shortly after his entrance Miller appeared and was directed by officer McVay to ascend the spiral staircase to the guard room above and go down to a visitors' window, on the other side of the partition on the same level with the vis-

itors' room, to receive his visitor. This unknown man was wearing brown clothes.

The State introduced testimony to the effect that Miller conversed but a very brief time, left his window, went back up to the guard room and then down into the prisoners' cage where he joined McNeil; that McNeil and Miller, one armed with a revolver and the other with an automatic pistol, "held up" James A. Meehan, the officer in charge of the prisoners' cage; that Miller took the officer's revolver and McNeil the key to the door between the prisoners' cage and the prison yard; that at practically the same time officer McVay, who was on the point of opening the door in the screen between the visitors' room and the prisoners' cage, was assaulted by a man dressed in brown who demanded the officer's keys; that McVay, who resisted his assailant, was knocked to the floor and shot several times, receiving wounds from which he later died; that while McVay was being assaulted and shot, a second man in the visitors' room "covered" with revolvers or pistols all visitors present and killed an inmate as the latter sent in an alarm.

These two assailants, seeing their plans miscarry, rushed from the prison, climbed into a waiting automobile and disappeared.

Meanwhile in the cage McNeil and Miller were making frantic efforts to open the door which McVay had not unlocked. They tried to break it down and, failing to accomplish this, they fired their weapons at the lock. Father Sullivan, the Catholic chaplain at the prison, entered the cage and endeavored to persuade McNeil and Miller to desist. Both refused but later, after further entreaties, Miller yielded. He was immediately surrounded by the police, and McNeil thereupon committed suicide.

Miller denied that he participated in the conspiracy or took any part in the attempt to accomplish the design until after McVay was shot. He contended that at the time of the fatal shooting he was either on or at the foot of the spiral stairway. He admitted shooting at the lock and at-

tempting to break down the door but contended that he did this through fear of McNeil.

Under cross-examination Miller admitted having been friendly with McNeil before either became an inmate of the State Prison and also admitted that prior to April 19, 1930, they spent a good portion of their recreation hours together in the prison yard.

The defendant contends that the court erred in instructing the jury that they might find him guilty of murder in the second degree. Exceptions 99, 100 and 106 were taken to such instructions.

Murder is defined by Sec. 1, Chap. 1392, P. L. 1929, as follows: "Section 1. Clause 1. The unlawful killing of a human being with malice aforethought is murder. Every murder perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious and premeditated killing, or committed in the perpetration of, or attempt to perpetrate any arson, rape, burglary or robbery; or perpetrated from a premeditated design, unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree. The degree of murder may be charged in the indictment therefor, and the jury may find the degree of murder whether the same be charged in the indictment or not, or may find the defendant guilty of a lesser offense than that charged in the indictment, in accordance with the provisions of section eleven of chapter four hundred seven of the general laws."

Considering all the evidence we think it would have been error to charge that murder in the first degree was the only crime of which the defendant could be found guilty. Much of the evidence as to when Miller joined the conspiracy and as to the question of premeditation and deliberation was circumstantial. There was evidence from which the jury might have found that the defendant joined the conspiracy a considerable length of time before the firing of the fatal shots and that the killing was deliberate, malicious and pre-

meditated; but they were not bound so to find. See *State v. Fenik*, 45 R. I. 309; 30 C. J. p. 404, §650; *State v. Chin Ting*, 136 Atl. (R. I.) 8. The killing was not in perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery. A killing in the perpetration or attempted perpetration of an offence not among those enumerated in our statute is not necessarily murder in the first degree. Wharton on Homicide, 3rd Ed. § 122; *State v. Atkinson*, 6 Ohio N. P. 232; *Kipper v. State*, 42 Tex. Cr. 613, 62 S. W. 420; *Commonwealth v. Dillen*, 210 Pa. St. 579, 60 Atl. 263; Brill Cyclopedia Criminal Law, Vol. II, §648.

In *State v. Saccoccio*, 50 R. I. 356, cited in the brief for the defense, the court, on the undisputed evidence, could only charge as to first degree murder. The homicide occurred in the course of a robbery and, by the language of the statute, was murder in the first degree.

Exceptions 1, 2, 3 and 4 were taken to the admission of photographs showing not only the bullet wounds on the body of McVay but the entire body. It was argued that the photographs would cause a feeling of repulsion and would prejudice the minds of the jury against the defendant. It is not contended that the photographs were not genuine and correct. They were competent to prove the nature of the wounds, the identity and cause of death of the deceased. Competent and material evidence should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible. *State v. Chin Ting, supra; Commonwealth v. Retkovitz*, 222 Mass. 245, 110 N. E. 293; Underhill's Criminal Evidence, 3rd Ed. §103 and cases cited.

Exception 16 was taken to the refusal of the trial court to dismiss the indictment. The brief for the defendant contains a statement that "not the slightest evidence of any kind appears in the record to connect Miller with the men who did the shooting." The statement is not correct. There was much circumstantial evidence connecting him with them. It was clearly shown that he was acting in concert

with them to effect an escape, and that one of them had visited Miller but a few seconds before McVay was shot. The jury were not bound to believe Miller's testimony. See *State* v. *Deslovers,* 40 R. I. 89; *State* v. *Mowry,* 21 R. I. 376.

Exception 98 was taken to the refusal to direct a verdict for the defendant. It is unnecessary to consider this exception further than to refer to the discussion of exception number 16.

Exceptions 20 to 34 and 36 to 97 inclusive were taken to the refusal of the trial court to permit the introduction of evidence to the effect that brutal and inhuman treatment was inflicted upon Miller in an alleged attempt to make him disclose the identity of his visitor on April 19, 1930, preceding the attempted jail delivery, and the source from which the weapons used by him and McNeil were obtained. No evidence to show a confession was introduced; therefore such facts had no evidentiary value.

Exception 107 was taken to an instruction to the jury as follows: "I charge you that as a matter of law it is not incumbent or necessary for the State to prove that the defendant Miller fired the shot which killed McVay, and if you find the defendant Miller became an active participant in any plan or conspiracy to effect his own escape or the escape of any other person from the Rhode Island State Prison at any time before Mr. McVay was shot, and in pursuance of such plan or conspiracy acted in concert with persons who have not been apprehended, then your verdict should be guilty."

The instruction was correct. The rule is well established that where several persons combine or conspire to commit an unlawful act, such as an attempt to escape from the State Prison, each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine. Each is responsible for everything done by one or all of his confederates, in the execution of the common design, as one of its probable and natural consequences, even though the act

was not a part of the original design or plan, or was even forbidden by one or more of them. *State* v. *Brown,* 45 R. I. 9; *State* v. *Saccoccio, supra; Henry* v. *State,* 237 S. W. 454; *State* v. *Parr,* 246 S. W. 903; *People* v. *Brown,* 207 Cal. 172; *People* v. *Stewart,* 293 Pac. 787; *State* v. *Jenkins,* 14 Rich. Law (S. C.) 215; *Hamlin* v. *State,* 48 Conn. 92; *Commonwealth* v. *Dillen, supra.*

Exception 108 was taken to an instruction as follows: "I charge you as a matter of law that if you find that the defendant had knowledge of the plan to escape from prison and with such knowledge descended into the cage and assisted McNeil then your verdict should be guilty." This instruction must be considered in connection with the other instructions which clearly informed the jury that in order to find Miller guilty they must find beyond a reasonable doubt that he was aware of the plot and became active, aiding and participating therein before the fatal shots were fired. In his charge the trial justice covered this subject so fully and clearly that there could have been no confusion in the minds of the jurors.

The trial justice has approved the finding of the jury. We have carefully read the transcript of the evidence and find no reason for disturbing the verdict.

All the defendant's exceptions are overruled and the case is remitted to the Superior Court for further proceedings.

*Benjamin M. McLyman, Attorney General, Edward W. Day, Assistant Attorney General, J. Clifden O'Reilly, 3d Assistant Attorney General,* for State.

*Hogan & Hogan, Edward T. Hogan, Laurence J. Hogan,* for defendant.