OPINION OF THE COURT
Chief Judge Cooke.
Two trials are considered here. Out of one evolve appeals by defendants McGee, Edwards and Tolliver, who were convicted, after a jury trial, of one count of conspiracy in the third degree and 28 counts of bribery in the second degree. From the other, arise appeals by defendants Quamina and Waters, who were convicted, upon a jury verdict, of one count of conspiracy in the third degree and 10 counts of bribery in the second degree. The judgments of conviction were affirmed by five separate orders of the Appellate Division and leave to appeal to this court was granted. For the reasons that follow, the order affirming the judgment of conviction of McGee should be modified to the extent of reversing the conviction on the bribery counts and dismissing the indictment as to those counts, and as so modified, affirmed. The remaining orders affirming the convictions of Quamina, Waters, Edwards and Tolliver should be affirmed.
I
At the joint trial of Quamina and Waters, the People’s theory was that the defendants proposed an arrangement whereby Rochester Police Officers Gerald Luciano and Gustave J. D’Aprile, members of the Vice Squad, would be paid to prevent the arrest of defendants’ gambling associates while enforcing the law against competitors. The evidence at trial consisted of the testimony of Luciano, D’Aprile, defendants and others, as well as tape recordings of conversations between the officers and defendants.
In an effort to enlist Quamina as an informant, Luciano suggested that a meeting be arranged to discuss organized crime activities in the black community. Quamina expressed interést, mentioning that he and Jake Waters had previously considered meeting with the officers. Quamina ultimately arranged a meeting for the morning of December 9, 1973. At *55 this and other prearranged meetings, D’Aprile was equipped with a hidden microphone for monitoring and recording. The officers sought information concerning mob activities in the Rochester area, and Quamina and Waters complained of pressures exerted by one Lippa, a purported mob leader, on black numbers operators. Both Quamina and Waters indicated that blacks should have some control of the numbers operation in their own community and discussed the formation of a black organization to replace the Lippa organization. They stressed the need for police protection, noting that profits would be enhanced if police pressure were exerted on competing operators. The officers were offered monetary and other benefits in exchange for their assistance.
At a subsequent meeting on March 3, the agreement to pay the officers for their services was reaffirmed with a minor modification: until the plan became fully operative, the officers were to be paid for each arrest rather than at a weekly rate. A list of competing numbers operators to be arrested was given to the officers. Five arrests were made based on the information supplied. At a meeting in late April, defendants supplied the officers with a list of operators who were not to be arrested. At an earlier April meeting Quamina and Waters each gave the officers $100; at two meetings in July, Waters paid a total of $200.
The defendants asserted the defense of coercion under section 200.05 of the Penal Law and the affirmative defense of entrapment under section 40.05 of the Penal Law. The defense presented evidence that in the fall of 1974, Waters complained to a friend that he had been shaken down by some police officers and repeated that claim to an official of the State Police and a Deputy Attorney-General. Quamina had made similar complaints. At trial, both Quamina and Waters testified that their fear of being arrested if they did not co-operate was their motivation for meeting and paying the officers.
II
Defendants McGee, Edwards and Tolliver were later brought into the operation. In October, 1974, Quamina arranged an organizational meeting at which he, Edwards, Tolliver and the officers were present. Edwards, proclaiming himself spokesman for those present as well as McGee, articulated the group’s desire to start a black organization, and suggested that the officers could make money if they wanted *56 to be "outlaws”. At a subsequent meeting with Edwards, the officers were told that they would receive a percentage of the receipts from assigned numbers writers in exchange for police protection. On November 13, there was a meeting with Edwards and McGee at which the group discussed the scope of police activity, as well as weekly payments to the police. No payments were made at that meeting. During the meeting, McGee indicated that he was in accord with Edwards’ goals. At various intervals during the ensuing months, Edwards made payments to the officers.
As in the trial of the other defendants, Edwards, Tolliver and McGee asserted coercion and entrapment defenses. According to Edwards, the officers threatened to put Edwards out of business if he did not agree to their terms. The parties finally agreed upon the sum of $100. Edwards admitted making payments but asserted that he stalled on giving information. Pressure was allegedly applied to Tolliver when Edwards failed to keep his appointments in an attempt to end the relationship. Edwards testified that he had no income from gambling, that the officers were shaking down the defendants, and that Edwards had never bribed a police officer.
III
Defendants assert numerous errors in the conduct of the trials, many of which are common to some or all of the defendants. A substantial argument is advanced by McGee alone, however, and that issue is treated first.
McGee argues that the Trial Judge erred in charging the jury that he could be found guilty of the substantive offense of bribery by virtue of his status as a conspirator. After determining that there was sufficient evidence of an agreement among the defendants to go to the jury on the conspiracy count, the court charged that each conspirator could be convicted of bribery on the basis of acts of any one of the coconspirators committed in furtherance of the conspiracy (see Pinkerton v United States, 328 US 640). The court also charged that McGee alone could be convicted of the bribery if he solicited, requested, commanded, importuned or intentionally aided another to engage in that offense (see Penal Law, § 20.00). McGee is correct in his contention that the portion of the charge concerning conspirator liability was erroneous. It is held that liability for the substantive offense may not be independently predicated upon defendant’s participation in an *57 underlying conspiracy. As there was no evidence of McGee’s complicity in the bribery counts submitted to the jury,[1] and thus no basis for accomplice liability, there must be a reversal of the conviction of bribery and a dismissal of the indictment as to those counts.[2]
In rejecting the notion that one’s status as a conspirator standing alone is sufficient to support a conviction for a substantive offense committed by a coconspirator, it is noted that the Legislature has defined the conduct that will render a person criminally responsible for the act of another. Conspicuously absent from section 20.00 of the Penal Law is reference to one who conspires to commit an offense. That omission cannot be supplied by construction. Conduct that will support a conviction for conspiracy will not perforce give rise to accessorial liability (compare Penal Law, § 105.05, with § 20.00). True, a conspirator’s conduct in many instances will suffice to establish liability as an accomplice, but the concepts are, in reality, analytically distinct. To permit mere guilt of conspiracy to establish the defendant’s guilt of the substantive crime without any evidence of further action on the part of the defendant, would be to expand the basis of accomplice liability beyond the legislative design.
The crime of conspiracy is an offense separate from the crime that is the object of the conspiracy. Once an illicit agreement is shown, the overt act of any conspirator may be attributed to other conspirators to establish the offense of conspiracy (cf. People v Salko, 47 NY2d 230; People v Sher, 68 Misc 2d 917) and that act may be the object crime. But the overt act itself is not the crime in a conspiracy prosecution; it *58 is merely an element of the crime that has as its basis the agreement (cf. People v Hines, 284 NY 93). It is not offensive to permit a conviction of conspiracy to stand on the overt act committed by another, for the act merely provides corroboration of the existence of the agreement and indicates that the agreement has reached a point where it poses a sufficient threat to society to impose sanctions (see 72 Harv L Rev 920, 998; 16 Ford L Rev 275, 277). But it is repugnant to our system of jurisprudence, where guilt is generally personal to the defendant (see Sayre, Criminal Responsibility for the Acts of Another, 43 Harv L Rev 689), to impose punishment, not for the socially harmful agreement to which the defendant is a party, but for substantive offenses in which he did not participate (Commonwealth v Stasiun, 349 Mass 38; see, generally, 56 Yale LJ 371).
We refuse to sanction such a result and thus decline to follow the rule adopted for Federal prosecutions in Pinkerton v United States (328 US 640, supra). Accessorial conduct may not be equated with mere membership in a conspiracy and the State may not rely solely on the latter to prove guilt of the substantive offense.[3]
Turning then to the other issues raised, we address the argument advanced by defendants Quamina, Edwards, Tolliver and McGee that there was an insufficient foundation laid for the introduction of the recordings of the meetings between defendants and the officers. Defendants urge that the People failed to establish a complete chain of custody of the tapes from the time they were made until the time of trial, thus rendering them inadmissible. In examining the foundation laid in these cases, however, it cannot be said that the Trial Judges erred in permitting the tapes to be introduced into evidence.
One of the officers wore a microphone during the meetings and the tapes were made on a Kel-Kit recording system; a cassette recorder was also used for many conversations. The *59 officers testified that they listened to the tapes immediately after they were made and determined that they accurately represented the conversations in which they had participated. There was testimony that the tapes had not been altered. From May 1, 1975 until the time of trial, the tapes were in the possession of a confidential assistant in the District Attorney’s office, who kept records of removal of tapes. The chain of •custody prior to that time is uncertain, for others had possession of the tapes at various times throughout the investigation.
At the outset, the invitation to extend to all recordings the requirements for electronic surveillance codified in CPL article 700 is declined. That comprehensive statutory scheme is designed to minimize the intrusion of electronic eavesdropping upon an individual’s right to privacy and to that end, its provisions have been strictly construed (see People v Washington, 46 NY2d 116). Particularly, we have insisted upon strict compliance with its sealing requirement (CPL 700.50, subd 2), recognizing that this serves to prevent tampering, protect the privacy interests of the participants to the intercepted conversation, and establish the chain of custody (People v Nicoletti, 34 NY2d 249, 253). When a party to the conversation consents to its recording, however, the constitutional privacy rights of other participants are not implicated (see United States v White, 401 US 745; Lopez v United States, 373 US 427; United States v Knohl, 379 F2d 427, cert den 389 US 973). Hence, it is unnecessary to superimpose the admissibility requirements of article 700 on consensual recordings.
 The standard to be applied, therefore, is that applicable to any real evidence sought to be admitted. In determining whether a proper foundation has been laid for the introduction of real evidence, the accuracy of the object itself is the focus of inquiry, which must be demonstrated by clear and convincing evidence (see United States v Fuentes, 563 F2d 527, 532, cert den sub nom. Sansone v United States, 434 US 959). Accuracy or authenticity is established by proof that the offered evidence is genuine and that there has been no tampering with it (cf. People v Julian, 41 NY2d 340, 342-343). The foundation necessary to establish these elements may differ according to the nature of the evidence sought to be admitted. For instance, a chain of custody is employed when "the evidence itself is not patently identifiable or is capable of being replaced or altered” (People v Connelly, 35 NY2d 171, *60 174 [drugs]). Mere identification by one familiar with the object, however, will be sufficient "when the object possesses unique characteristics or markings” and any material alteration would be readily apparent (id.; see People v Flanigan, 174 NY 356).
Tape recordings made by a participant to a conversation do not fall within the category reserved for fungible evidence, such as drugs. The uniformity of these substances, making identification difficult, generally, justifies a requirement of tracing fungible goods through each hand with which it comes in contact. The inherent difficulty with fungible goods simply is not present when evidence of a conversation is sought to be introduced, for the conversation itself is unique and the participants are available to attest to its accuracy. Thus, a chain of custody is not required for the introduction of tape recordings such as those present here.
A foundation may be established by a participant to the conversation who testifies that the conversation has been accurately and fairly reproduced (see United States v Amrep Corp., 560 F2d 539, cert den 434 US 1015; United States v Steinberg, 551 F2d 510; United States v Knohl, 379 F2d 427, cert den 389 US 973, supra; Monroe v United States, 234 F2d 49, cert den 352 US 873). Proof that the evidence has not been altered may be established in a similar fashion. This testimony, if credited by the Trial Judge, is sufficient to establish that the taped conversation accurately and fairly represents the event to which it refers.
On this record, there is sufficient proof of accuracy and authenticity of the tapes offered to warrant their admission. The infirmities concerning chain of custody or inaudibility properly go to the weight of the evidence, not its admissibility (cf. People v Julian, 41 NY2d 340, supra; People v White, 40 NY2d 797).
Finally, defendants urge that the People failed to disprove the bribery defense of coercion (Penal Law, § 200.05) beyond a reasonable doubt and that the evidence establishes the affirmative defense of entrapment (Penal Law, § 40.05) as a matter of law. The record does not support these contentions; the issues were properly submitted to the jury.
 The affirmative defense of entrapment is designed to prevent punishment for an offense "which is the product of the creative activity of [the State’s] own officials” (Sorrells v
*61 United States, 287 US 435, 451). Whether a defendant is predisposed to commit an offense or was induced to commit the offense is a question of fact (see People v Freeman, 36 NY2d 768; People v Sundholm, 58 AD2d 224; People v Shangraw, 55 AD2d 796). Similarly, the coercion defense, designed to relieve from liability for bribery one who is a victim of extortion or coercion by the public servant allegedly bribed (see Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 200.15, p 420), presents factual issues (see People v Court, 43 NY2d 817, affg 52 AD2d 891).
The record before us presents a conflict between the People’s version of events and that of defendants. Defendants asserted that the police officers induced their participation in the bribery scheme and employed coercive tactics to ensure compliance. Though the record does reveal some evidence of conduct that might be construed as harassment, there is also evidence of mutual co-operation. Hence, resolution of the issues was a purely factual matter within the province of the jury. Nor does the record compel application of this court’s recent decision in People v Isaacson (44 NY2d 511), as the facts here simply do not present the kind of reprehensible conduct condemned in that case.
We have examined the remaining arguments that have been preserved for review and find that none form the basis for reversal.
Accordingly, the order of the Appellate Division in People v McGee should be modified in accordance with this opinion by dismissing the bribery counts of the indictment and, as so modified, affirmed. The orders of the Appellate Division as to the other defendants should be affirmed.

. The trial court dismissed two bribery counts on the ground that there was no agreement on November 13 to pay the specific amount of $50 to each officer as charged in the indictment. The court determined, however, that there was sufficient evidence of an agreement among defendants and the remaining counts were submitted to the jury.

. We reject McGee’s further claim that his statutory right to a speedy trial was violated by the delay between his indictment on May 1, 1975 and commencement of trial on February 14, 1977. On the motion to dismiss, court congestion was assigned as the reason for the delay and counsel for McGee in effect admitted that the People were ready for trial within three months of the indictment. Thus, the defendant is not entitled to dismissal pursuant to CPL 30.30 (People v Conrad, 44 NY2d 863).
Nor were McGee’s rights under CPL 30.20 or the Constitution violated. Given the relevant factors, including the length of the delay, the lack of incarceration and the absence of a claim of prejudice, neither CPL 30.20 nor the Constitution would require dismissal (see People v Taranovich, 37 NY2d 442; compare People v Moore, 47 NY2d 872).

. We are not unmindful of cases indicating that "[e]ach conspirator is liable * * * for the acts of every associate done in the effort to carry the conspiracy into effect” (e.g., People v Collins, 234 NY 355, 361; see, also, People v Luciano, 277 NY 348; People v Michalow, 229 NY 325; People v McKane, 143 NY 455). Those cases, however, do not support extending the agency rationale to impose liability for the substantive offense solely on the basis of liability for the agreement. Indeed, closer examination of each of them reveals that the defendant had actively participated to a degree sufficient to impose accessorial liability.