**STATE**

**v.**

**Ronald F. BARTON et al.**

**No. 79–429–C.A.**

Supreme Court of Rhode Island.

Jan. 15, 1981.

Reargument Denied April 7, 1981.

Dennis J. Roberts II, Atty. Gen., Stephen Lichatin III, Spec. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Peter A. DiBiase, Richard A. Gonnella, Providence, Oteri & Weinberg, Vincent Savarese III, Judith H. Mizner, Boston, Mass., for defendants.

## OPINION

KELLEHER, Justice.

This indictment charged the defendants, Ronald F. Barton (Barton) and James Murphy (Murphy), as well as five other individuals, with conspiring to break into and enter a building in the nighttime with intent to commit larceny therein, the possession of burglary tools, and the malicious destruction of communication lines belonging to the New England Telephone Company. Barton, Murphy, and Arthur M. Barrett (Barrett) went to trial on all three counts before a Superior Court jury. The jury acquitted Barrett and returned guilty verdicts on all counts against Barton and Murphy.

There is little dispute regarding the essential facts of this case. In May 1977 members of the Rhode Island State Police along with agents of the Federal Bureau of Investigation (FBI) conducted a joint investigation of the activities of a Johnston resident by the name of Anthony Fiore (Fiore), one of the conspirators named in the indictment. Their investigation was implemented by an order of the United States District Court for the District of Rhode Island entered on May 13, 1977, which permitted a surreptitious entry into Fiore's home for the purpose of installing listening devices in four designated areas within the premises. The law-enforcement authorities also kept Fiore's house under surveillance through

the use of some sophisticated photographic equipment, which took pictures of the goings on at this location.

Armed with the information obtained through the listening devices and the cameras, the investigators were able to observe several meetings between Barton, Murphy, and several of the named conspirators. It soon became apparent that Murphy and Barton were part of a group demonstrating a significant interest in a manufacturing plant located in an industrial park situated in the extreme westerly portion of Lincoln, Rhode Island. The plant was owned by Vennerbeck and Clase, Inc. (Vennerbeck). Vennerbeck specializes in the manufacture of gold-alloy products, which it supplies to the jewelry industry. In late May of 1977, Vennerbeck had on hand over $1 million worth of precious metals.

Nineteen seventy-seven's Memorial Day weekend was something more than a holiday for the troopers and agents who later testified at the trial. On Sunday evening, May 29, several of the State Police and federal agents assigned to this detail were secreted inside the plant. The officers remained in the plant until 3 a.m. on May 30. During their stay, the telephone rang twenty or thirty times and various noises were heard outside the building, but nobody attempted to enter. The jury had been told that the persistent ringing of the phones indicated that an attempt was being made to bypass the alarm system.

At approximately 7:30 p.m. on May 30, the stakeout team returned to the industrial park. Three FBI agents took a position behind a stone wall that ran along an embankment located across the road passing in front of Vennerbeck's plant. Other members of the detail were placed at such strategic places in the surrounding neighborhood as Angell Road near Rolling Woods Drive, Jenckes Hill Road, and the North Central Airport. Sometime close to 11:15 p.m. the agents stationed behind the wall observed four men pass in front of them and stop about fifteen yards away. Three of the new arrivals walked down onto the road and removed the cover from a manhole

which was situated in the middle of the road. The glare of a flashlight indicated that the trio was examining the interior of the manhole. The agents heard one of the group conversing on a walkie-talkie; he reported, "Everything looks good. Nobody has discovered our work. It's great. We should have no trouble." The quartet's sense of well-being must have received a shock when its correspondent reported, "Okay, we've got a problem here. Go back." At this point, the quartet began to retrace its steps, but the retreat became a rout when Murphy literally stepped on one of the agents and was arrested, while the other three fled through the nearby wooded area.

At 11:40 p.m. Detective Trooper Brian R. Andrews (Andrews) left his assigned point of surveillance on Angell Road and drove to Vennerbeck's plant. After a ten-minute stay he returned to the Angell Road area. At 12:55 a.m. on May 31, he observed a "subject" turn the corner from Angell Road onto Rolling Woods Drive. The subject walked up a driveway, opened the door of a parked green Pontiac, took out a black bag, and placed that bag in a garage at the end of the driveway. The garage is attached to a home. The subject then went back to the Pontiac and extracted a crowbar, which he also placed in the garage. The subject returned to the Pontiac, and as he started to back down the driveway, he was arrested at gunpoint. The subject was Barton. A search of Barton disclosed that he was carrying a walkie-talkie.

The owner of the Rolling Woods Drive property testified at trial and denied any knowledge of the various and sundry equipment found in his garage, including such items as a large acetylene tank and torch, pinch bars, crowbars, and a sledgehammer.

At approximately 5:30 a.m. on May 31, Barton's walkie-talkie appeared to have come alive. Detective Andrews explained to the jury that he had momentarily returned to the Vennerbeck plant area when he heard the walkie-talkie emit a very weak "squelch break." He then told the jury that if one hears a "squelch," it is an indica-

tion that someone is attempting to transmit a message. Andrews and his associates then began to change locations within the area to see if they could increase the strength of the incoming signal. When they reached a point on Jenckes Hill Road, they heard a voice saying, "Three to one. Three to one." The officers made no response because they felt the individual transmitting was using some type of code. Finally, Andrews acknowledged a message in which the voice said, "Come pick me up."

At that point, the police returned to the Lincoln State Police Barracks where they picked up an Oldsmobile Cutlass which, along with the green Pontiac, had been removed to the barracks from the Rolling Woods Drive driveway. With Andrews driving and Lieutenant Edward J. Correia secreted in the back seat, they attempted to follow the instructions that came over the radio. They were looking for a street with a yellow street sign. After going down a road, they were told, "You just went by me. Come back again." Andrews, happy to comply, turned the vehicle around, parked it, and activated the right directional signal lights. A voice then inquired, "Is that you with the directional light on?" Andrews responded in the affirmative. Andrews was then told to leave the vehicle and pretend that he was changing a tire. As Andrews was crouching over the right front tire, an individual jumped over from behind a bush, a smile on his face as he started to run for the car. When he was halfway to his destination, the smile disappeared from the face of Santo M. Diaferio.

Detective Corporal Richard Wheeler, a member of the stakeout detail, testified that at approximately 7 a.m. on May 31, he arrested an individual who was walking westerly on Jenckes Hill Road. The individual was Kenneth Holmes. Holmes's dungarees and shoes were wet. Detective Wheeler attributed Holmes's dampened condition to the fact that Holmes, like Wheeler, had spent much of the early-morning hours traveling through the nearby woods with Holmes being the pursuee and Wheeler the pursuer.

Another witness at the trial was Peter Hunt, a police officer employed by the town of Lincoln. On June 1 at approximately 3:30 a.m. he received a radio message to check out an individual who was seen walking along the Old Louisquissett Pike. Officer Hunt picked up an individual by the name of Spurgeon Cox.[1] Cox sported a day's growth of beard, his clothes were wet, there were grass and leaves stuck to his clothes, and according to Officer Hunt, he looked like he had been out in the woods.

The sole issue[2] presented before this court on appeal is whether the trial justice committed error by instructing the jury on the vicarious liability of coconspirators. The trial justice instructed the jury:

"Beside the offense of conspiracy, a defendant may also be convicted of any crime that was committed by himself or by other coconspirators that was done in furtherance of the object of that unlawful agreement. In short, the act or declaration of one conspirator is evidence against the other coconspirators if such act or declaration was in furtherance of the unlawful agreement."

The trial justice also elaborated on this instruction by giving the following example:

"[I]f you find beyond a reasonable doubt that the offense of possession of burglar

1. Superior Court records indicate that the state, for reasons not readily ascertainable, dismissed the indictment as it applied to Diaferio. Cox and Holmes, after having been released on bail, have become fugitives, and warrants are outstanding for their arrest. Fiore has pleaded nolo to the charges and is presently incarcerated.

2. Barton and Murphy also argue that conviction of conspiracy as charged in count I of the indictment was not supported by sufficient evidence. However, neither defendant moved for judgment of acquittal with respect to count I. In State v. Giordano, R.I., 413 A.2d 93 (1980), this court observed that our rule has been that in the absence of a showing that the defendant raised the issue in the lower court, we shall refuse to consider the issue on appeal. As a result, we do not address this issue. See also State v. Haigh, 112 R.I. 740, 315 A.2d 431 (1974).

tools and/or the offense of injury to communication lines was committed * * * by 'A,' a member of the alleged conspiracy, that 'B,' another defendant, was then a member of the conspiracy, and that [the criminal acts were] * * * done in furtherance of the unlawful agreement * * * and that 'B' might reasonably have foreseen that those acts would be done by 'A,' then you may find defendant 'B' guilty of that offense, even though he did not otherwise, personally, participate in the act complained of or did not have knowledge of said act."

The case most often cited when speaking of vicarious liability in a conspiracy context is *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)[3] where the Supreme Court ruled that in conspiracy situations a criminal act by one partner in furtherance of the conspiracy may be attributed to all partners in the conspiracy without any new agreement to accomplish the act. The Court stated, " '[A]n overt act of one partner may be the act of all without any new agreement specifically directed to that act.' " *Id.* at 646–47, 66 S.Ct. at 1184, 90 L.Ed. at 1496. The Court modified this rule to some extent by acknowledging that

"[a] different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647–48, 66 S.Ct. at 1184, 90 L.Ed. at 1497.

The Supreme Court's rationale was based on the theory that a conspiracy is a partnership in crime and that the intent to commit the substantive offense, as well as to effectuate the conspiracy, is established at the time of the formation of the conspiracy. The Court observed that a principle is recognized in the law of conspiracy that "the overt act of one partner in crime is attributable to all." *Id.* at 647, 66 S.Ct. at 1184, 90 L.Ed. at 1497. The Court reasoned that since the overt act necessary to create a conspiracy can be supplied by one partner, "we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense." *Id.* The end result is to make vicarious criminal responsibility as broad as civil liability of a partner for acts of other partners in the course of the business of the partnership. The *Pinkerton* rule continues to be in effect in the federal courts.[4] *See e. g. United States v. Decker*, 543 F.2d 1102 (5th Cir. 1976); *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976); *United States v. Gomez*, 529 F.2d 412 (5th Cir. 1976); *United States v. Finkelstein*, 526 F.2d 517 (2d Cir. 1975); *United States v. Bermudez*, 526 F.2d 89 (2d Cir. 1975).

The question of the criminal liability of a conspirator for the commission of a substantive offense having some causal connection with the conspiracy but not in the contemplation of the conspirator and committed by other conspirators has been a matter of considerable debate and controversy. *See* Sayre, *Criminal Responsibility for the Acts of Another*, 43 Harv.L.Rev. 689 (1930). The *Pinkerton* rule has found favor with many states under a variety of theories. Under one view, vicarious liability is supported on the premise that criminal acts, aside from the object of the conspiracy, are dependent upon the encouragement and material support of the group as a whole

**3.** In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the defendant was convicted of both conspiracy and various substantive tax violations committed by his brother while the defendant was in prison on other charges.

**4.** *Pinkerton* was subsequently reaffirmed in *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949), when the Court stated, "In *Pinkerton v. United States, supra*, a conspiracy and substantive offenses were charged. We held that a conspirator could be held guilty of the substantive offense even though he did no more than join the conspiracy, provided that the substantive offense was committed in furtherance of the conspiracy and as a part of it." *Id.* 328 U.S. at 618, 69 S.Ct. at 769, 93 L.Ed. at 925.

and therefore justify treating each member of the conspiracy as an agent for the other or others. "One of the surest ways to encourage another to commit a crime is to enter into a conspiracy with him for the accomplishment of that very result." Perkins, *The Act of One Conspirator*, 26 Hastings L.J. 337, 358 (1974). Under another view, the *Pinkerton* rule is supported on the theory that group activity presents a greater potential threat to the public than individual action. "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312, 317 (1961); *see also Woods v. United States*, 240 F.2d 37 (D.C.Cir.1956). In a similar vein, others have suggested that conspiracy provides a vehicle whereby criminals will engage in more elaborate and complex schemes than they would attempt if working alone, and therefore such activity should be discouraged via the *Pinkerton* rule. *See Bell v. Commonwealth*, 220 Va. 87, 255 S.E.2d 498 (1979); Note, *The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants*, 62 Harv.L.Rev. 276 (1949).

Much of the criticism directed at the *Pinkerton* rule has been aimed at the group-encouragement theory in that it may be just as likely that "a large number of participants will increase the prospect that the plan will be leaked as that it will be kept secret; or that the persons involved will share their uncertainties and dissuade each other as that each will stiffen the others' determination." Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 414 (1959); *Developments in the Law: Criminal Conspiracy*, 72 Harv.L.Rev. 920, 998 (1959). Others have challenged the

*Pinkerton* rule on the grounds that it is premised on an unsound analogy to general partnership theory. *Cf. United States v. Bermudez*, 526 F.2d 89 (2d Cir. 1975) (analogy to grocery partnership inapt and misleading in conspiracy context). The proposed new Federal Criminal Code would abolish "a judicially developed doctrine which imposes complicity liability based solely upon membership in to the conspiracy." Hearings on Reform of Federal Criminal Law Before the Subcommittee on Criminal Law and Procedures of the Senate Committee on the Judiciary, 92d Cong., 1st Sess. pt. 1 at 225 (1971).[5]

Barton and Murphy speak of an emerging trend by courts to reject *Pinkerton* to the extent that it imposes liability for all crimes committed in furtherance of the conspiracy. In *People v. McGee*, 49 N.Y.2d 48, 424 N.Y.S.2d 157, 399 N.E.2d 1177 (1979),[6] the Court of Appeals expressly rejected the *Pinkerton* rule as repugnant to our system of jurisprudence to "impose punishment, not for the socially harmful agreement to which the defendant is a party, but for substantive offenses in which he did not participate." *Id.* at 58, 424 N.Y.S.2d at 162, 399 N.E.2d at 1182. The conclusion of the Court of Appeals was based, in part, on the fact that the New York Legislature had addressed itself to the issue of vicarious liability and failed to make reference to the criminal liability of coconspirators. Section 20.00 of the New York Penal Code states:

"When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct."

The court treated the omission as a rejection of the *Pinkerton* rule which preempted

---

5. Similarly, the drafters of the Model Penal Code suggested that "liability for a substantive crime as an accomplice cannot be predicated on the sole fact of having been party to a conspiracy to commit that crime * * *." Model Penal Code § 5.03(6) Comment at 143 (Tent. Draft No. 10, 1960).

6. *People v. McGee*, 49 N.Y.2d 48, 424 N.Y.S.2d 157, 399 N.E.2d 1177 (1979), involved a situation in which the defendant was convicted of conspiracy and bribery although there was no evidence of McGee's complicity in the bribery counts submitted to the jury.

the ability of the court to adopt the rule by construction. *People v. McGee,* 49 N.Y.2d at 56, 399 N.E.2d at 1181, 242 N.Y.S.2d at 161.

In *Commonwealth v. Stasiun,* 349 Mass. 38, 206 N.E.2d 672 (1965), the Supreme Judicial Court of Massachusetts ruled that " '[i]t cannot be held that a conspirator is as [a] matter of law an aider or abettor in the perpetration of the crime whose commission he has agreed with others to accomplish.' " *Id.* at 49, 206 N.E.2d at 680. However, the court was not promulgating a new rule but was merely reaffirming its holding in *Commonwealth v. Knapp,* 9 Pick. 496 (1830). There the court stated:

> "The fact of the conspiracy being proved against the prisoner, is to be weighed as evidence in the case having a tendency to prove that the prisoner aided, but it is not *in itself* to be taken as a legal presumption of his having aided unless disproved by him. It is a question of evidence for the consideration of the jury." (Emphasis in original) *Id.* at 518–19.

■ In considering the issue presently before us, we find that we are not writing on a clean slate. Thirteen years before the Supreme Court made its pronouncement in *Pinkerton* this court spoke in *State v. Miller,* 52 R.I. 440, 161 A. 222 (1932). *Miller* was a defendant convicted of second-degree murder, a conviction based upon his participation while a prisoner in an escape conspiracy that resulted in the death of a prison guard who was shot and killed resisting the efforts of another conspirator. In *Miller* we held:

> "The rule is well established that where several persons combine or conspire to commit an unlawful act, such as an attempt to escape from the State Prison, each is criminally responsible for the acts of his associates or confederates in the furtherance of any prosecution of the common design for which they combine. Each is responsible for everything done by one or all of his confederates, in the execution of the common design, as one of its probable and natural consequences, even though the act was not a part of the original design or plan, or was even forbidden by one or more of them." *Id.* at 445–46, 161 A. at 225.

We regard the rule as just stated to be sound and viable. Moreover, the position articulated in *Miller* continues to be the majority rule. *See e. g. Pendleton v. State,* 57 Ala.App. 454, 329 So.2d 145 (1976) (each member of the conspiracy is responsible, civilly and criminally, for everything that may consequently and subsequently result from such unlawful purpose); *Johnson v. State,* 252 Ark. 1113, 482 S.W.2d 600 (1972) (each conspirator is responsible for every crime that is a natural and probable consequence of the conspiracy); *People v. Carmichel,* —— Cal.App.3d ——, 164 Cal.Rptr. 872 (1980) (conspirator chargeable with crimes committed by coconspirator); *Norman v. State,* Miss., 381 So.2d 1024 (1980) (act of any conspirator is act of all conspirators); *State v. Stein,* 70 N.J. 369, 360 A.2d 347 (1976) (conspirator is responsible for all the criminal acts committed in furtherance of the conspiracy); *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976) (conspirator is responsible for acts of coconspirators which are committed in furtherance of common design).

■ Although it may appear to some that this rule is unduly harsh, such harshness may be considered as an occupational hazard confronting those who might be tempted to engage in a criminal conspiracy within a jurisdiction that adheres to the so-called *Pinkerton* rule. The severity of the rule, however, is ameliorated by the requirement that the collateral offense giving rise to the conviction must be a natural or foreseeable consequence of the conspiracy.

The appeals of Barton and Murphy are denied and dismissed, the judgments of conviction appealed from are affirmed, and the case is remanded to the Superior Court.

BEVILACQUA, C. J., and DORIS, J., did not participate.