■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v TONY NEGRI, Respondent.—Order, Supreme Court, New York County (Brenda Soloff, J.), entered January 29, 1986, which dismissed the indictment charging defendant-respondent with conspiracy in the fifth degree, unanimously reversed, on the law, and the indictment reinstated.

The People take this appeal from the order dismissing the indictment herein which charged defendant and four other codefendants with conspiring to receive and resell $4,800,000 in bearer bonds which were to be stolen from a brokerage house. Although the court below found that the conspiracy was in existence in August 1984, the court concluded that it was a conspiracy "which defendant did not join" because there was no evidence of an agreement between defendant and the other codefendants charged in the indictment. We find, however, that the evidence presented to the Grand Jury, when viewed most favorably to the People, establishes each of the necessary elements of the conspiracy charged (Penal Law § 105.05).

Detective Joseph Pepe, posing as a corrupt businessman named "Joe", infiltrated an organization headed by codefendant Russell Mannino, which was involved in the purchase and sale of forged or stolen commercial paper. Detective Pepe purchased stolen American Express travelers cheques and forged credit card receipts from codefendant Edward Micciulli, who acted as intermediary between the detective and the Mannino organization. Detective Pepe continued to purchase the fraudulent paper from Micciulli during the spring of 1984.

In May 1984, Micciulli asked if the detective or any of his friends could steal bearer bonds. Micciulli explained that the bonds would be used as collateral for a loan and the loan proceeds, in an amount less than the face value of the bonds, would be the profit of the crime. The topic came up again in June 1984. Detective Pepe told Micciulli that he had a friend in a brokerage house who had access to "a couple of million dollars worth of bonds". On June 11, Micciulli told the detective that he was interested in obtaining $5,000,000 worth of bonds.

Detective Pepe obtained photostatic copies of $4,800,000 worth of bearer bonds, some of which he gave to Micciulli to show to members of the organization to see if these were the type of bonds that they wanted. Throughout June and July, Detective Pepe and Micciulli were involved in negotiations regarding the bond deal. Detective Pepe kept pressing for

more information about the other participants in the transaction and eventually Micciulli identified Mannino and his assistant, codefendant Alan Monchik, as the middlemen working for a man identified only as Angelo. Micciulli mentioned that "a guy from the Village, Tony" was also involved in the bond deal, referring to defendant Tony Negri.

Micciulli, who testified before the Grand Jury pursuant to a cooperation agreement with the New York County District Attorney's office, recounted that Russell Mannino had introduced him to defendant because defendant was interested in purchasing bonds. Micciulli told defendant what Detective Pepe had offered and defendant "wanted to see if he could do anything with it." Micciulli explained that defendant "had other people involved in this, and he would have to confront them to get some kind of commitment." Detective Pepe convinced Micciulli to arrange a meeting with Tony, which he did. At this meeting in Greenwich Village on August 3, 1984, Detective Pepe was introduced to Tony, defendant herein, who identified himself as an associate of Russell Mannino. Detective Pepe was wearing a concealed recording device and the tape and the transcript of his conversation with Micciulli and defendant were presented to the Grand Jury.

This meeting was a bargaining session between defendant and Detective Pepe regarding the anticipated proceeds and how to divide them. Although Detective Pepe was offering $4,800,000 worth of bonds, defendant had understood that the deal was for only $2,000,000 worth of bonds. Defendant explained that "[t]he guy I spoke to said that if you walk in with two million dollars worth of bonds" the bank would be willing to lend only 75% of their face value, or $1,500,000. However, defendant pointed out, "the people that are holdin' these are taking the vig" and, consequently, the sellers would only net $750,000. The three men then discussed how the $750,000 would be divided among the participants.

Defendant represented himself as a middleman, saying that "[a]ll I'm trying to get is our side together with their side. See all I'm doin' right now is, is trying to carry back a message." He continued: "the figure that was told to me for two is seven fifty, now what do you want out of seven fifty? Twenty percent is a hundred fifty." The following exchange then ensued:

"MICCIULLI: We've got a total of six people from here. Russ, okay? Him, your friend * * *

"PEPE: Right. There's me, there's my friend * * *

"MICCIULLI: Six.

"PEPE: You * * *

"PEPE & MICCIULLI: Tony.

"MICCIULLI: Russ and Alan.

"PEPE: Russ and Alan."

When Micciulli began to speculate about whether "Russ and Alan" were supposed to be involved in the deal, defendant replied "I'm only really with Russ I don't wanna start gettin' who's not in it, who's in it, who's this, who's that, you know".

This testimony was sufficient to establish defendant's specific intent to participate in the conspiracy to convert stolen bearer bonds to cash. The Supreme Court's characterization of defendant's role as "the representative of a potential buyer" is inaccurate. In the taped conversation, defendant associated himself with the Mannino organization and voiced no objection when he was counted as one of the participants to share in the proceeds. Whether defendant was acting as the agent for a potential buyer or as the seller's agent is not an issue. The evidence indicated that defendant knew of the unlawful scheme and that he intended to further it by finding a purchaser for the stolen bonds and to share in the profits. As it turned out, defendant was not successful in finding a buyer. But this fact is immaterial to the existence of the conspiracy and defendant's participation in it.

New York has adopted the unilateral approach to conspiracy *(People v Schwimmer,* 66 AD2d 91, 95 [2d Dept 1978], *affd* 47 NY2d 1004 [1979]), which focuses on the defendant's individual state of mind rather than on the collective intent or "meeting of the minds" of the conspirators. "The requisite intent is to join with others to commit a substantive crime. If an individual believes he has so joined, it is sufficient to establish complicity, regardless of the actual fact of agreement." *(Supra,* at 95-96.)

As the court below found, there was evidence that a conspiracy existed in August 1984, involving Micciulli, Mannino and certain of his associates. Copies of the bonds to be stolen had been passed to the Mannino organization, to determine whether they could be used by a prospective buyer to secure a bank loan. Mannino introduced defendant to Micciulli because of defendant's interest in taking the bonds. It also appears from the taped conversation that, prior to the meeting on August 3, defendant had already contacted a prospective purchaser who was offering $750,000 for $2,000,000 worth of bonds. Defendant's meeting with Micciulli and Detective Pepe was further evidence of his intent to aid in the planning or

commission of the underlying crimes of grand larceny and criminal possession of stolen property. Once there is proof of an illicit agreement, "the overt act of any conspirator may be attributed to other conspirators to establish the offense of conspiracy (cf. *People v Salko,* 47 NY2d 230; *People v Sher,* 68 Misc 2d 917)" *(People v McGee,* 49 NY2d 48, 57 [1979]).

We find that the evidence supports the People's case that defendant entered into the conspiracy prior to the meeting with Detective Pepe on August 3, and that by communicating the offer of $750,000 and by negotiating this offer with the detective, defendant manifested his intent to further the unlawful agreement. Concur—Murphy, P. J., Sandler, Sullivan, Rosenberger and Smith, JJ.