*522 OPINION OF THE COURT
Meyer, J.
The predicate for admission of tape recordings in evidence is clear and convincing proof that the tapes are genuine and that they have not been altered. Absent such proof, the defendant’s concession that the voice on the tapes is his or hers and that he or she recalls making some of the statements on the tapes does not exclude the possibility of alteration and, therefore, does not sufficiently establish authenticity to make the tapes admissible. Moreover, when, as here, tapes which are admitted to prove motive contain evidence of crimes other than that for which defendant is on trial, unrelated to motive or the relevance of which to motive is outweighed by its prejudicial effect, which is not itself otherwise admissible and not explanatory of the acts done or words used in the admissible part of the tapes, such material should be redacted before submission of the tapes to the jury. The tapes admitted in this case having been admitted without sufficient foundation and without proper redaction, the order of the Appellate Division affirming the judgment of conviction should be reversed and a new trial ordered.
I
On February 6, 1982, Raymond Ely was to have commenced overnight visitation with his son, Robert, pursuant to a stipulation entered into during the course of the divorce proceedings between him and defendant, Karen Ely, his estranged wife. On February 5, 1982, however, Raymond Ely was found dead on the passenger side of the front seat of his station wagon, which was parked behind a bus terminal in downtown Albany. Defendant and Robert Huntington were charged with his murder in an indictment alleging that the deceased was strangled in the cellar of defendant’s Rensselaer home on the night before his body was discovered, and then transported to Albany. Defendant’s primary motive for the killing, the People later would argue, was to deny Raymond Ely the opportunity to visit overnight with their son.
Huntington pleaded guilty to murder in the second degree and was the prosecution’s chief witness against defendant at the trial out of which this appeal arises. He testified that during the first week of January 1982, defendant approached him and enlisted his services in the murder of her husband. Pursuant to a prearranged plan, Raymond Ely was invited to *523 defendant’s home on February 4, 1982 at 7:30 p.m. to pick up certain items of personal property which it had been agreed were to be retained by him. Stating that she needed assistance with some cleaning up in the cellar, defendant, according to Huntington, lured her husband into the basement where Huntington was waiting. While defendant held her husband’s wrists, Huntington strangled him with a clothesline. After defendant checked him for a pulse and removed all his possessions "to make it look like a robbery had occurred,” the two carried the body of Raymond Ely into his station wagon, which Huntington then drove into downtown Albany, where he abandoned it. The following day, defendant told Huntington that she and Robert’s baby-sitter had disposed of defendant’s possessions in a dumpster in East Greenbush.
Huntington testified that the purpose of the murder, as he understood it, was to stop the deceased from exercising his "visiting rights * * * for their son, Robert.” According to Raymond Ely’s matrimonial attorney, Paul Oliver, defendant and the deceased had stipulated that defendant would have five successive Sunday visits with their son, after which overnight weekend visitation would commence on Saturday, February 5, 1982. Notably, Huntington told the jury that when on the night of the killing he expressed doubt about carrying out the murder plan, defendant stated, "Don’t back out on me now. We have to do it tonight. We have to do it before the weekend.”
The most damning evidence of motive, however, consisted of three tapes of recorded telephone conversations between defendant and the deceased (exhibits 39, 40 and 41). The recordings were made by the deceased at his attorney’s suggestion during August and September 1981, and were intended for use as evidence in the parties’ then pending divorce proceeding. Prior to commencement of the trial, defendant’s attorney sought a ruling (see, People v Ventimiglia, 52 NY2d 350, 362) excluding the tapes on the ground of relevance, marital privilege and prejudice. The Trial Judge denied the request, reasoning that the conversations were not privileged because not made as part of an attempted reconciliation, but reserved decision as to relevancy pending proof at trial "as to what the motive is.” In response to the prosecutor’s offer of proof, the court further commented that if the People succeeded at trial in presenting evidence that defendant’s motive was to prevent the deceased from keeping the child overnight, the court *524 would admit the tapes as relevant, subject to proof of the requisite foundation.
The evidence of foundation presented at trial as to exhibits 39 and 40 came from Raymond Ely’s roommate, who testified that the tapes had been made by him outside their home, at a time and place unknown to her, and then placed by him in a shopping bag which he stored in the living room and later moved into the bedroom closet. After the murder she retrieved the tapes from the closet and turned them over to the police.
As to the tape designated exhibit 41, Paul Oliver testified that, in or about September 1981, he received it from Raymond Ely and thereafter kept it in Ely’s file at his office until he, too, handed the tape to the police. He also testified that in his opinion the notations on all three tapes were in the handwriting of Raymond Ely. He conceded, however, that Ely had had exhibit 41 in his own possession "probably” for "anywhere from three weeks to a month” before delivering it to him.
Custody of all three tapes after delivery to the police was established by the testimony of Police Officer Mancuso, and defendant stipulated in court that the female voice on the tapes was hers. In separate rulings as to exhibits 39 and 40 and then as to exhibit 41, the Trial Judge held that sufficient foundation had been established.
A substantial portion of the content of the tapes involved Raymond Ely’s unsuccessful efforts to persuade defendant to allow him visitation with their son. Defendant’s steadfast refusal to acquiesce in such requests is evidenced by those portions of the tape in which she offered to waive her claim to child support, despite her $50 per week wages, in exchange for an agreement that the deceased would have no visitation rights, and by her repeated statements that he would be afforded visitation "over my dead body.”
Defendant based her position in respect of visitation, at least in part, on her contention that Robert, then about two years old, did not want to see his father because he had done "something” to frighten the boy. But she also maintained that the deceased was not the boy’s father and the tapes include the first conversation during which she so informed him. In response to Raymond Ely’s statements that he thought that her pregnancy was their attempt at improving a troubled marriage, defendant explained that she would have left the deceased before the child was even conceived but remained *525 with him because she was then under indictment for arson and it was the feeling of her attorney that her defense would be enhanced if she continued in the marriage. She had, therefore, waited until the charges were dropped before leaving him.
Similar references to the arson charges appear throughout the tapes. On a number of occasions defendant reacted to her husband’s asking, in disbelief that he was not the father of the child, how she could "live a lie” by not revealing that to him earlier, by responding repeatedly that she lied because she had to, in light of her attorney’s advice that she remain married while the arson charge was pending. On one occasion, however, she added that if the deceased pressed forward with court proceedings, she would "swear” in court, in support of her claim for child support, that he was Robert’s father, adding that "of course I’ll do what I have to in Court. Doesn’t everybody?”
After the Trial Judge held the foundation of the tapes sufficient, defendant moved that there be redacted from them references to the fire and related arson charge, as well as the fact that defendant’s lawyer had advised her to live with the deceased until the arson charge was dismissed.[1] He argued that these references were unfairly prejudicial, especially in light of the dismissal of the arson indictment. The prosecutor countered that the tapes, themselves, would inform the jurors about the dismissal and that "the rest go to the willingness and ability to lie,” i.e., to defendant’s credibility. The Trial Judge denied the motion, reasoning that "the entire tape is relevant to motive, that there’s a flavor to it. It is a cohesive whole and to chop it up into little pieces like that really diminishes the integrity of the exhibit.” Defense counsel requested reconsideration of that ruling after the playing of the first tape revealed 12 separate references to the arson charge. Reasoning again that the conversations went to motive and that "many of these things are intertwined,” the Trial Judge denied the motion, adding that defendant’s claim of prejudice *526 was overstated because the dismissal of the arson charge was mentioned on the tapes.
Defendant testified in her own behalf, denying involvement in the murder and stating that Huntington had told her that he, alone, killed Raymond Ely. On cross-examination, the prosecutor confronted defendant with a series of statements which, more often than not, she admitted were correctly recorded on the tapes.[2] Defendant did not, however, concede that the tapes were completely accurate and, in fact, she did not recall having made certain statements with which she was confronted.[3]
[4]The People argue on the basis of these admissions and of defense counsel’s summation statement that "[defendant] admits what was said on those tapes” that foundation was sufficiently established or was waived.
The jury returned a verdict of guilty of murder in the second degree. On appeal from the judgment of conviction, the Appellate Division affirmed (115 AD2d 171). It held that there was sufficient foundation for admission of the tapes "in the testimony of the victim’s mother™ and the decedent’s matrimonial attorney concerning custody of the exhibits”, in defendant’s stipulation that it was her voice on the tapes, and in her several admissions on cross-examination that she recalled portions of the conversations recorded on the tapes (115 AD2d, *527 at pp 173-174, supra). As to redaction, it held the references to the pending arson charges relevant as bearing upon defendant’s motive and as an explanation concerning why defendant, having allegedly become pregnant by another man, remained with her husband as long as she did (ibid., at p 174).
Defendant appeals by leave of a Judge of this court (67 NY2d 882). Because the foundation for the tapes was not sufficiently established, there must be a reversal and a new trial and, in view of the possibility that on the further trial a proper foundation may be established, we note that, because much of the material on the tapes was neither related to nor inextricably interwoven with material related to motive, redaction from the tapes of such material will be required unless admissible on some other ground than to establish motive.[5]
II
Admissibility of tape-recorded conversation requires proof of the accuracy or authenticity of the tape by "clear and convincing evidence” establishing "that the offered evidence is genuine and that there has been no tampering with it” (People v McGee, 49 NY2d 48, 59, cert denied sub nom. Waters v New York, 446 US 942). The necessary foundation may be provided in a number of different ways. Testimony of a participant in the conversation that it is a complete and accurate reproduction of the conversation and has not been altered (People v McGee, 49 NY2d, at p 60, supra; People v Arena, 48 NY2d 944, 945; United States v Sandoval, 709 F2d 1553, 1555; United States v Buzzard, 540 F2d 1383, cert denied 429 US 1072) or of a witness to the conversation or to its recording, such as the machine operator, to the same effect (e.g., United States v Hassell, 547 F2d 1048, 1054, cert denied sub nom. McIntosh v United States 430 US 919; United States v McMillan, 508 F2d 101, 104-105, cert denied 421 US 916; Gonzales v United States, 314 F2d 750, 752) are two well-recognized ways. Testimony of a participant in the conversation together with proof by an expert witness that after analysis of the tapes for splices or alterations there was, in his or her opinion, no indication of either (United States v Craig, 573 F2d 455, 477-478, cert denied 439 US 820) is a third available method.
A fourth, chain of custody, though not a requirement as to *528 tape recordings (People v McGee, 49 NY2d, at p 60, supra), is also an available method (United States v Halderman, 559 F2d 31, 109, cert denied sub nom. Mitchell v United States, 431 US 933; United States v Hughes, 658 F2d 317, 323; United States v Blakey, 607 F2d 779, 787; United States v Fuentes, 563 F2d 527, cert denied sub nom. Sansone v United States 434 US 959). It requires, in addition to evidence concerning the making of the tapes and identification of the speakers, that within reasonable limits those who have handled the tape from its making to its production in court " 'identify it and testify to its custody and unchanged condition’ ” (People v Connelly, 35 NY2d 171, 174). This was the method employed in the instant case, but the testimony presented failed to establish precisely when or even where the recordings were made by decedent and thus left open the possibility that they had been altered by him in some way before they were (as to exhibits 39 and 40) brought to the apartment where he resided or (as to exhibit 41) turned over to attorney Oliver.
Were there other foundation proof to overcome that discrepancy, the gap in the chain of custody would affect the weight but not the admissibility of the tapes (People v McGee, 49 NY2d, at p 60, supra). Here, however, the record is devoid of further proof. Defendant’s stipulation that the voice on the tapes is hers does no more than identify the speaker, but, as already indicated, identity and authenticity are separate facets of the required foundation, both of which must be established (see also, United States v Biggins, 551 F2d 64, 66; United States v Hassell, 547 F2d, at pp 1054-1055, supra). Indeed, in view of the ease with which voices may be transposed on tapes and the difficulty, except for an expert, of detecting such a change, this must necessarily be so. To the extent that People v Theriault (75 AD2d 971), relied on by the Appellate Division (115 AD2d, at p 174, supra), suggests the contrary, it is not to be followed.
Moreover, the gap in the proof was not remedied by defendant’s admissions during cross-examination that she recalled having made particular statements contained on the tape (see, n 2, supra). Limited as they are to isolated portions of the conversation, these admissions do not satisfy the requirement that the fairness and accuracy of the entire recorded conversation be established as a predicate of admissibility (People v Arena, 48 NY2d 944, supra, affg 65 AD2d 182, 183; see, People v McGee, 49 NY2d, at p 60, supra; United States v Buzzard, 540 F2d, at p 1386, supra; United States v McKeever, 169 F *529 Supp 426, revd on other grounds 271 F2d 669), the more particularly so in light of defendant’s denial that she recalled making a number of other statements with which she was confronted (compare, United States v Parodi, 703 F2d 768, 790 [upholding admissibility where defendant admitted that he " 'said what was on the tapes’ ”], with United States v Wells, 525 F2d 974, 976 [denying admissibility where, among other things, defendant denied making statements]). Nor did the statement of defendant’s attorney made during summation that "[s]he admits what was said on those tapes” supply the missing foundation or waive that deficiency in the introduction of the tapes, for that statement was made long after the tapes were admitted in evidence and in the context in which made clearly was limited to an admission that her husband had said to her "these lies will catch up with you.”
Because the evidence presented was insufficient to supply the required foundation, it was an abuse of discretion as a matter of law for the Trial Judge to admit them into evidence.
Ill
There is no question that those portions of the tapes which tended to establish that defendant’s motive for procuring the murder of her former husband was to prevent his having overnight visitation with the child fall within one of the recognized exceptions to the rule proscribing introduction of evidence of uncharged crime (People v Ventimiglia, supra; People v Molineux, 168 NY 264). The Molineux exceptions are, however, subject to limitations.
The first, which "is intended to eliminate the danger that a jury may convict to punish the person portrayed by the evidence before them even though not convinced beyond a reasonable doubt of his guilt of the crime of which he is charged” (People v Ventimiglia, 52 NY2d, at p 359, supra), requires that the evidence not only be probative of the crime charged, but also that its probative value "outweighs its potential for prejudice” (id.; accord, People v McKinney, 24 NY2d 180, 184). The second limits that which is to be admitted pursuant to the exception to evidence which is directly related to the issue upon which offered or which, though not itself directly related, is "inextricably interwoven” with directly related material in the sense that it is "explanatory of the acts done or words used in the otherwise admissible part of the evidence” (People v Ventimiglia, 52 NY2d, at p 361, *530 supra; accord, People v Crandall, 67 NY2d 111, 116-117; People v Vails, 43 NY2d 364, 368). A third is that the evidence not be unnecessary to the People’s case (e.g., evidence of identity when identity is conclusively established, People v Robinson, 68 NY2d 541 [decided herewith]), or merely cumulative (People v Ventimiglia, 52 NY2d, at p 361, supra).
Thus, that a tape contains relevant evidence is but the beginning of the inquiry, not the end of it. Whether there should be redaction of a tape turns not, as the Trial Judge here ruled, upon whether "there is a flavor to it,” but on whether the material to be redacted is more prejudicial than probative. Nor does it turn on "the integrity of the exhibit,” except as material not itself directly probative is essential to an understanding of what is.
The People argued before the Trial Judge and before us that virtually all of the statements contained in the tapes were probative of motive because they demonstrated not only defendant’s opposition to allowing her husband to visit overnight with their son, but also that she and the deceased lived in a "charade marriage relationship” during the time when the arson charge was pending. They rely upon People v Scott (153 NY 40), People v Buchanan (145 NY 1) and People v Harris (136 NY 423). In each of those cases, however, as well as in People v Benham (160 NY 402), the purported motive for the murder was the spouse’s "desire to get rid of the marriage relation” (People v Harris, 136 NY, at p 451, supra; People v Scott, 153 NY, at p 50, supra; People v Buchanan, 145 NY, at pp 22, 27, supra), in proof of which evidence of infidelity was held admissible. Here, however, the motive sought to be established was not to rid defendant of the marital relationship — for that she chose the conventional and entirely legal means of divorce — but to deny her husband the opportunity of establishing a truly parental relationship with the child through overnight visitation. As to that, defendant’s efforts to get the decedent to waive his visitation rights and her threats that he would obtain visitation "over my dead body,” for example, were clearly relevant and admissible. That they had been living "in a charade marriage relationship” which, but for the pendency of the arson charge, would have been sooner terminated by divorce, the procurement of which was already in progress when the tapes were made (and which ultimately resulted in visitation provisions contrary to defendant’s wishes), was not.
*531 Nor were the many references to the arson charges, and other highly prejudicial material on the tapes, admissible because "inextricably interwoven” with evidence admissible as probative of motive. Prejudicial material "not necessary to a full comprehension of the” directly related evidence (People v Ward, 62 NY2d 816, 818) is inadmissible, even though part of the same conversation (id.; People v Ventimiglia, 52 NY2d, at pp 360-361, supra) or, indeed, of the same sentence (People v Crandall, 67 NY2d, at pp 116-117, supra). So, in People v Vails (43 NY2d, at p 368, supra) reference to prior drug sales was held "intrinsic to the bargaining” between defendant and the undercover officer and admissible because "concerned [with] the price to be paid and the quality of the drugs,” but in People v Crandall (67 NY2d, at p 117, supra) redaction of the exact amount of money paid at the time of the drug purchase for which defendant was being tried was required, because "not necessary to comprehension” and because, it being more than the agreed price of the drugs then sold, would have revealed to the jurors that another uncharged drug sale had occurred. Thus, it is not enough that prejudicial unrelated other crime evidence is part of a "cohesive whole” or even that it may assist the jury by shedding light upon the "contextual setting” in which a statement was made (People v Ward, 62 NY2d, at p 818, supra); to be admissible it must be necessary to comprehension of the otherwise admissible statements.
It follows from the foregoing principles that the many references to the arson charge should have been, and on retrial should be, redacted, even though the tapes also revealed that the charges had ultimately been dismissed. While a defendant who takes the stand may be interrogated on cross-examination concerning a criminal act committed even though not formally charged with it (Richardson, Evidence § 498, at 483 [Prince 10th ed]), that could not justify introduction as part of the People’s direct case of the arson evidence, unless otherwise admissible. The prejudicial impact of involvement in arson, a crime of violence, is pointed up by the Trial Judge’s Sandoval ruling, which prohibited cross-examination of defendant about her alleged role in the fire for the very reason that such questioning would portray her as a person predisposed to commit violence. Nor can we agree that prejudice would necessarily be obviated by the revelation that the charges had been dismissed, for dismissal of a criminal charge is not tantamount to acquittal (cf. People v Vidal, 26 NY2d *532 249, 253), a fact of which, it may be assumed in this day of pervasive media coverage of crime, the average juror will not be unaware. Because there was, therefore, no basis other than that they were part of the taped conversation for admission of the references to the arson charges, and defendant’s refusal to grant her husband’s requests for visitation were readily comprehensible without such references, they should have been redacted as requested.
Review of the tape transcripts pursuant to the request for redaction discloses much other material that should be excluded, either on the People’s direct case or entirely. In the former category is defendant’s statement that she would lie under oath, for it is axiomatic that the credibility of defendant as a witness is not in issue until she testifies (see, People v Rahming, 26 NY2d 411, 418; People v Harris, 25 NY2d 175, 177; People v Kulis, 18 NY2d 318, 322-323). Such statements will become admissible on retrial, if defendant again takes the stand, but only as part of the People’s rebuttal (see, People v Santarelli, 49 NY2d 241, 247-249). In the latter category are the many disparaging and at times vulgar remarks directed by defendant at her husband, illustrative of which are her responses to his requests to see his son: "I said go find another broad and go make a son then, if you want to see one” and "[i]f you want to see your son, go out and make one with some chippy that you’re living with.” Such statements go more to defendant’s base character than to her motive for the murder of her husband. Although marginally probative, they are both cumulative and so unduly prejudicial as to require redaction (People v Ward, supra), for it is indeed questionable whether even a clear limiting instruction would have overcome the prejudice thus engendered United States v Cianchetti, 315 F2d 584, 589-591; see, People v Ventimiglia, 52 NY2d, at p 362, supra).
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
Order reversed, etc.

. For example, the tapes contain the following exchange between defendant and the deceased:
"male: I wasn’t going to bed with anybody when we were together, never.
"female: We weren’t together. We were only together because my father asked you to stay. I only told you that [the baby] was yours because I was afraid that I was going to jail if I didn’t have a husband, just the way Paul Sleasman [defendant’s attorney on the arson charge] told me. Now, honest to God, Raymond, just please let it alone.” (Material in brackets added.)

. The People point to the following exchange between the prosecutor and defendant:
"Q. Do you remember saying repeatedly that Raymond Ely would get visitation over your dead body?
"A. Yes, I do.
"Q. Do you remember saying if he got visitation you would move with the child to Florida?
"A. Yes I do.
"Q. Do you remember saying that you wanted your husband out of your life and out of Robert’s life?
"A. Yes, sir.
"Q. Do you remember Raymond saying on those tapes after you told him for the first time that Robert was not his child, that he now would have to take Robert off his insurance?
"A. Yes.
"Q. Do you remember telling him not to do that yet?
"A. Yes, I do.”

. For example, defendant denied admitting to her husband in a taped conversation that the only reason she feared that he would kidnap their child was that he had on one occasion been five minutes late in returning the child to her after a visit with him.

. The reference should have been to decedent’s roommate, whose testimony regarding the tapes is summarized above.

. We have considered defendant’s other arguments and find them either unpreserved or without merit.