■ The People of the State of New York, Respondent, v Lillie Joyner, Appellant. [660 NYS2d 398] —Judgment, Supreme Court, New York County (Edwin Torres, J.), rendered October 13, 1994, convicting defendant, after a trial by jury, of robbery in the first and second degrees, assault in the second degree and criminal possession of a weapon in the second degree, and sentencing her, as a second felony offender, to concurrent indeterminate terms of imprisonment of $12^1/_2$ to 25 years, $7^1/_2$ to 15 years, and two terms of $3^1/_2$ to 7 years, respectively, unanimously reversed, on the law, and the matter remanded for a new trial.

Complainant Charles James, 87 years old, and the 29 year-old defendant had been friends and occasional lovers for approximately two years at the time of the December 20, 1993 incident that gave rise to the instant charges. According to

James, the defendant visited him once or twice a week and cleaned his apartment, ran errands for him and occasionally had sex with him, but she very rarely stayed overnight with him. In exchange for the chores he would give her $5 or $10, but he never paid her for sex. On the date in question, the defendant came to his apartment around 10 A.M. and they had sexual intercourse. When they were finished, the defendant asked James for $50, which James refused to give her, saying he did not have it. The defendant then put her hand in his pocket and took his wallet, and, when he reached for the telephone to call for help, the defendant grabbed a bread knife and cut the telephone cord. A struggle ensued, during which the defendant hit James, cutting his head, and then fled out onto the fire escape. James screamed for help several times and then passed out in a chair.

Meanwhile, Grover Reed, a security guard, heard James screaming for help and the angry voice of a woman, and immediately thereafter heard one of the maintenance staff yelling that there was a woman on the fire escape. Reed went outside and saw the defendant climbing down the fire escape. When she saw Reed, she changed direction and climbed to the top, where she tried unsuccessfully to get onto the roof, and then descended to the second floor and entered James's window. Reed intercepted her in the stairwell between the first and second floors and held her until the police came. When Reed asked the defendant why she had cut James, she replied that she did it because James had raped her or tried to rape her. The defendant also told Police Officer Andrei Giglevitch that James had raped her.

According to Giglevitch, James's head was covered with blood, the phone line had been cut and the apartment was in complete disarray as if a struggle had taken place. Although James did not remember saying it, Giglevitch testified that James, in a semi-conscious state, advised him that he and the defendant had had sex and that "[s]he wanted some money * * * we argued over the price. I [James] had taken out my wallet to give her, she grabbed the wallet. I went to hold her and we started fighting and she cut me". James's wallet was later found in the defendant's pocket.

After being given *Miranda* warnings, the defendant gave a written statement to Detective Dennis Ryan indicating that on the morning in question she visited James to tell him that she was living with her boyfriend and to ask him for food money. She had sex with James, after which she asked him for $50, but James "disagreed and started for the phone", and she cut

the telephone cord. She then said that she "cut him because he hit me". At that point, she picked up James's wallet and went out the fire escape. However, when a security guard yelled up at her she reentered James's apartment, where James began pulling at her jacket. She ran from the apartment but was surrounded by security guards, who held her until the police arrived. The defendant stated to the detective, "I didn't mean to hit him with that knife, but he provoked me by saying that I was a whore and that my boyfriend was pimping me. He was a very jealous old man, he always was". The defendant did not tell Detective Ryan that she had been raped or assaulted.

The defendant testified that between 1991 and 1993 she had worked as a prostitute to support a crack cocaine habit but that she had a "relationship" with James which was not based on prostitution and which consisted of her doing chores for him, having sex with him from time to time and occasionally staying at his apartment. In exchange, he gave her money and crack. She went to James's apartment that morning to tell him that she was no longer taking drugs, that she was living with her boyfriend, who was also the father of her newborn child, and that she didn't want to see James anymore. James threatened to kill her if she left him and, when she went to a closet to collect her clothes, he took a knife and told her that he was going to kill her. The defendant said, "I'll do anything you want me to do, you don't have to do that", after which she and James had sex, during which James never let go of the knife.

When the defendant tried to leave the apartment, James grabbed her coat, told her she wasn't going anywhere and threatened to kill her if she left. The defendant tried to get out the front door and, after seeing security guard Reed outside the door, yelled, "Help, help, he's raping me". The defendant and James struggled for the knife and the defendant was able to take it away from him. He then grabbed her as she tried to get out onto the fire escape, and she "slashed him to try to keep him from getting to me". After dropping the knife in James's apartment, the defendant climbed down the fire escape, but a security guard at the bottom told her to go back upstairs. She therefore reentered James's apartment and was able to get out the door. Reed grabbed her near one of the exits. One of James's neighbors also testified for the defense that he heard a woman scream, "Rape," during the time the struggle was taking place.

During a pre-trial colloquy, the prosecutor noted that while the defendant was incarcerated she made several phone calls

to James from Rikers Island and that some of the calls were taped by the District Attorney's Office. The court asked whether the prosecutor intended to use them if the defendant elected to take the stand, and the prosecutor replied that he did and that defense counsel was aware of his position. The court confirmed that defense counsel was aware of the tapes and ruled that it would make a determination regarding their admissibility during the course of trial.

During the defendant's direct examination she testified that James never visited her in jail. "I called him on the phone, and he asked me if I would come stay with him, if I need any place to stay, I could come stay with him still. I said I would think about it". During cross-examination the defendant again admitted that she called James from jail and spoke to him on the phone, then said that she tried to call him but he would not accept the charges, then said she did not remember whether she spoke to him or not.

After a break, when cross-examination continued, the defendant again admitted calling James from jail and said she would recognize her conversation with him if she heard it again. However, the defendant testified either that she didn't remember, or denied making certain statements to Mr. James in which she admitted that she took his wallet, and that with regard to her attack with the knife she stated, "I didn't mean to do it, but you made me upset".

At that point, the prosecutor announced his intention to play the tapes on rebuttal. Defense counsel stated, "Judge, there's been no foundation for these tapes", to which the court responded, "Put it all in writing". Moreover, when defense counsel again objected to the introduction of the tapes into evidence, the court stated, "Yes, you have a total objection, an overarching objection to all of this, which you have reiterated and made quite explicit on the record, but we've exhausted that so let's go on to the next thing".

During the course of the tapes as they were played into evidence, a woman whom the prosecution contended was the defendant repeatedly tried to persuade James to drop the charges and said she had not meant to kill James, while acknowledging that she had taken his wallet and had cut him with the knife.

We find that, in light of the prosecution's failure to establish the accuracy of the recordings and the circumstances surrounding the making of the recordings, there was not a sufficient foundation for the admissibility of the two tape-recorded telephone conversations and the conviction must therefore be reversed.

In *People v Ely* (68 NY2d 520, 527) the Court of Appeals held: "Admissibility of tape-recorded conversation requires proof of the accuracy or authenticity of the tape by 'clear and convincing evidence' establishing 'that the offered evidence is genuine and that there has been no tampering with it' * * * The necessary foundation may be provided [by] * * * [t]estimony of a participant * * * [or a witness to] the conversation * * * that it is a complete and accurate reproduction of the conversation and has not been altered * * * [t]estimony of a participant in the conversation together with proof by an expert witness that after analysis of the tapes for splices or alterations there was, in his or her opinion, no indication of either * * * [or by proving] chain of custody". *(See also, People v McGee, 49 NY2d 48, 59, cert denied sub nom. Waters v New York, 446 US 942.)*

Initially, we find that there is no basis for the prosecutor's contention that the defendant's argument is not preserved. The defendant's objection that "there has been no foundation for these tapes" clearly raised both the issues of identity and authenticity.

Moreover, a review of the record reveals no testimony establishing precisely when the tapes were made or where James was at the time they were made. Nor was there any evidence indicating that the tapes were not altered before they were introduced into evidence or that they depicted the entire conversation between the parties. Under these circumstances, the authenticity of the tapes was clearly not established.

We must reject the prosecution's argument that these tapes were admissible merely because the *identity* of the parties was arguably established by circumstantial evidence. Even assuming the validity of the prosecution's argument that the jury was entitled to infer the defendant's identity as one of the participants from the sound of the voice on the tape *(see, People v Shapiro, 227 AD2d 506, lv denied 88 NY2d 1024; People v Lynes, 49 NY2d 286, 291-292)*, that does not eliminate the necessity of establishing an adequate foundation for authenticity of the tape *(supra)*.

There is similarly no merit to the prosecution's argument that, since the tapes were admitted solely for the purpose of impeachment, it may meet its burden by considering each of the individual statements on the tape on its own and evaluating its admissibility without regard to whether the authenticity of the tape as a whole was established. Such an exception would simply swallow the rule, allowing bits and pieces of a tape-recorded conversation to be excised and admitted for

purposes of impeachment without any opportunity for either the defense or the jury to examine the true and full context in which the statements were made. Thus, in *People v Ely* (*supra*) the Court noted that the gap in the proof with respect to authenticity was not remedied even where the defendant specifically recalled and admitted having made certain of the statements that were on the tape, since the prosecution was required to demonstrate "the fairness and accuracy of the entire recorded conversation" (68 NY2d, *supra*, at 528).

Finally, the prosecution's argument that, given the overwhelming evidence at trial, the tapes themselves had little impact on the jury's determinations and that their admission was therefore harmless, is without merit. It is readily apparent that the tapes were extremely prejudicial to the defendant and completely undermined her defense. In support of the defendant's allegations of self-defense, there was testimony that a woman was heard screaming, "Rape", during the defendant's struggle with James, that the defendant claimed to have been raped as soon as she was apprehended and that James, immediately after the incident, had admitted to the police that he had had sex with the defendant and that they had then argued. Accordingly, there was some support in the record for a version of the events supporting a justification defense. Clearly, the jury was faced with rather confusing testimony depicting a very quickly unfolding struggle in which each party's precise behavior was difficult to determine. The admission of the tapes, during which the defendant tried to persuade James to "drop the charges," and never accused him of rape or denied that she had cut him, may well have tipped the balance for the jury in deciding that it should credit James's version of the events, i.e., that their sexual encounter had been consensual and the defendant had then tried to steal his money and to deliberately and unjustifiably cut him with the knife. Indeed, the prosecution was obviously so certain of the importance of the tapes to its case that it replayed them in toto during summation. Under these circumstances, we cannot find that the erroneous introduction of the tapes into evidence was harmless error. Concur—Ellerin, J. P., Wallach, Rubin and Mazzarelli, JJ.