# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 33
The People &c.,
    Respondent,
    v.
Melvin Baez,
    Appellant.

Harold V. Ferguson, Jr., for appellant.
Christopher J. Blira-Koessler, for respondent.

CANNATARO, J.:

Defendant Melvin Baez was convicted after a nonjury trial of possessing a quantity

of cocaine. The sole question on appeal is whether the People laid a legally sufficient

foundation for admission of the drugs into evidence. We agree with the courts below that

- 1 -

the People's showing established a legally adequate chain of custody and provided reasonable assurances of the identity and unchanged condition of the evidence.

I.

At approximately 11:00 p.m. on February 4, 2014, NYPD officers Mark Lewis and Shuyi Lin observed defendant using his cell phone while driving and conducted a traffic stop (*see* Vehicle and Traffic Law § 1225-d [1]).  When defendant rolled down his window to speak with the officers, Officer Lewis observed that defendant had bloodshot eyes and slurred speech and both officers smelled marijuana in the car.  The officers asked defendant to step out of his vehicle and arrested him, at which point Officer Lewis conducted a search for weapons and contraband.  As Officer Lewis placed his hand inside the pocket of defendant's jacket, defendant made a jerking motion and a clear plastic bag with a white substance inside fell to the ground.  Defendant stomped on the bag and dragged it with his foot before being moved away by Officer Lewis.  Officer Lin retrieved the bag, which she testified had been torn.  To keep the contents of the bag safe while in transit to the station, Officer Lin placed the bag inside a latex glove and tied the glove shut.

When Officer Lin arrived at the station, she placed the latex glove and its contents inside a narcotics envelope used to voucher and safeguard drugs.  Because she had to return to patrol and was not permitted to keep the evidence with her, she left the envelope on a desk inside an office at the police station and told Officer Lewis where to find it.  She testified that the only other person in the office at the time was an administrative officer tasked with watching evidence recovered by other officers during arrests.

Early the next morning Officer Lewis found the narcotics envelope where Officer Lin had told him to look for it inside the station. According to Officer Lewis, the envelope contained both the latex glove, which he recalled Officer Lin using to secure the evidence, and the plastic bag recovered from defendant. Inside the plastic bag was a white substance and a smaller plastic bag containing 45 even smaller Ziploc packets. Officer Lewis separated the bag holding the 45 Ziploc packets from the larger bag and photographed the two items of evidence.[1] Officer Lewis then weighed all the evidence by placing "everything together on one uncalibrated scale."

After photographing and weighing the evidence, Officer Lewis placed the evidence back inside a manilla narcotics envelope and completed a voucher invoice. He then sealed the envelope and invoice inside a plastic security envelope. The narcotics envelope, voucher invoice, and security envelope each had unique identification numbers. The voucher invoice indicated that the evidence consisted of two items with the same description: "Alleged crack cocaine; color: white; packaged in: clear plastic bag; form: rock; 9 grams in total." Officer Lewis placed the security envelope inside a safe at the station. Once inside, the evidence could only be retrieved by an officer assigned to transport the evidence to an NYPD laboratory.

The People also called Yanitza Osorio, a criminologist from the NYPD laboratory who analyzed the white substance three days after defendant's arrest. Osorio testified that

---

[1] The photograph was introduced into evidence at trial. It does not depict the latex glove and neither officer testified what became of the glove.

when she received the security envelope, its seals were intact and it contained no visible damage.[2] When she opened the contents of the manilla narcotics envelope inside, she found a clear plastic bag containing "loose solid material," and a "second item, which was one clear plastic Ziploc bag containing forty-five clear plastic Ziploc bags containing solid material residue." Osorio filled out a discrepancy form because the voucher invoice appeared to describe two identical bags of alleged crack cocaine. She did not notice any rips in the plastic bags. Osorio weighed the white substance in the first bag and determined it was 5.535 grams of cocaine. She did not test the "residue" in the "second item" containing the 45 Ziploc packets. Osorio then resealed the evidence and completed her report. The identification numbers listed in the report match those used by Officer Lewis.

At the conclusion of the People's case, defendant filed a written motion to dismiss the indictment, arguing that the cocaine was inadmissible because the People failed to establish a complete chain of custody and there were no reasonable assurances that the substance examined by Osorio and introduced at trial was authentic. After permitting defendant to supplement his written papers with an oral statement on the record, Supreme Court denied defendant's motion. As relevant here, the court found defendant guilty of criminal possession of a controlled substance in the fourth degree (Penal Law § 220.09 [1]), while acquitting him of several other charges. Defendant appealed and the Appellate Division unanimously affirmed, holding that the evidence was legally sufficient to

---

[2] Presumably, Osorio would take note of the condition of the security envelope because damage to that envelope could be indicative of tampering with its contents.

establish the chain of custody of the cocaine and provided reasonable assurances of the identity and unchanged condition of the evidence (202 AD3d 1102 [2d Dept 2022]).  A Judge of this Court granted defendant leave to appeal (38 NY3d 1186 [2022]).  We now affirm.

II.

Before a court will admit into evidence an object allegedly taken from a defendant or found at the scene of a crime, the People must first lay a foundation that the object is the one recovered and that its condition is substantially unchanged (*People v Connelly*, 35 NY2d 171, 174 [1974]; *accord People v Julian*, 41 NY2d 340, 342-343 [1977]).  In the case of a fungible item, such as a package of white powder, a sufficient foundation is provided when " 'all those who have handled the item identify it and testify to its custody and unchanged condition' " (*Julian*, 41 NY2d at 343, quoting *Connelly*, 35 NY2d at 174).  We have cautioned that this "chain of custody" requirement should not be "extended to unreasonable limits" (*id.*; *see also People v Ely*, 68 NY2d 520, 527-528 [1986]).  In addition, "[g]aps in the chain of custody may be excused when circumstances provide reasonable assurances of the identity and unchanged condition of the evidence.  Such gaps go to the weight of the evidence, not its admissibility" (*People v Hawkins*, 11 NY3d 484, 494 [2008] [internal citation omitted]; *People v White*, 40 NY2d 797, 799-800 [1976]).  In keeping with the purpose and function of the chain of custody approach, the primary focus of the reasonable assurances inquiry is on whether, "during the gap in the chain of custody, some *unknown* party"—i.e., an individual not called for questioning and assessment— "could have caused a material and prejudicial change in the condition or nature of the

evidence" (*Julian*, 41 NY2d at 344; *see Connelly*, 35 NY2d at 175-176 ["the fact that the item was or might have been accessible to *other persons not called as witnesses* casts suspicion on the integrity of the evidence often rendering it inadmissible especially when it appears that the evidence was available to *unknown* persons over an extended period" (emphases added)]).

Here, the People called every individual known to have handled the evidence from the time of its seizure to trial, other than those officers who merely transported the evidence in sealed packaging between locations (*see Connelly*, 35 NY2d at 175 [rejecting the notion that when an exhibit has been mailed for analysis each postal employee who handled the item should be considered a necessary link]). Defendant argues that a gap in the custodial chain existed between the time the evidence was left at the police station by Officer Lin and the time it was picked up by Officer Lewis. But even accepting that there was a short period of time during which the evidence was not fully sealed or attended by a testifying witness, the People's foundation was sufficient to "provide reasonable assurances of the identity and unchanged nature of the evidence" (*Julian*, 41 NY2d at 342-343 [internal quotation marks and citations omitted] [drugs properly admitted despite People's failure to account for their "day-by-day location" over a three-year period]; *see Connelly*, 35 NY2d at 175-176 [failure to testify that evidence was locked away or indicate how custody was maintained at all times was not determinative]; *see also People v Pearson*, 224 AD2d 779, 779 [3d Dept 1996], *lv denied* 88 NY2d 940 [1996]).

Specifically, the record indicates that the gap spanned, at most, only a few hours overnight and "[a]t all times, the drugs apparently remained safely under police control" in

an identifiable location at a precinct station (*see Julian*, 41 NY2d at 343-344). Officer Lin testified that she placed the evidence inside an envelope used to voucher drugs, and that the only other person in the office at the time was an administrative officer who was tasked with safeguarding such evidence. In leaving the evidence at the station to resume her patrol, Officer Lin followed a procedure intended to reduce opportunities for error and misconduct (*cf. Pearson*, 224 AD2d at 779; *see also Julian*, 41 NY2d at 341-343). When Officer Lewis arrived to voucher the evidence, "the drugs were found precisely where they were supposed to be" (*see Julian*, 41 NY2d at 343). He testified that the envelope contained not only the white substance and other materials recovered from defendant's pocket but also the latex glove he recalled Officer Lin using at the scene. These circumstances reduce the risk that the condition of the evidence changed or that it was handled by someone not called as a witness during the brief period in which it was left at the station.

Defendant argues that no reasonable assurances exist to bridge the gap in the chain of custody because there are discrepancies in how the evidence was described at various points between its recovery and trial. Several courts have held that gaps in a custodial chain will not be excused where there are clear and material discrepancies in the record regarding the condition, appearance, or handling of contraband that are never explained by the prosecution, leaving no reasonable assurance that the evidence was not altered during the gap in custody (*see e.g., People v Montoya*, 244 AD2d 510, 510-511 [2d Dept 1997]; *People v Espino*, 208 AD2d 556, 557 [2d Dept 1994], *lv denied* 84 NY2d 1031 [1995]; *People v Steiner*, 148 AD2d 980, 981-982 [4th Dept 1989]). But if a gap is brief and logical

explanations for the inconsistencies are provided, or can reasonably be inferred from the surrounding circumstances, such discrepancies merely raise weight and credibility issues for the jury to resolve in assessing whether the People met their ultimate burden of establishing proof of guilt beyond reasonable doubt (*see e.g.*, *People v Sarmiento*, 168 AD2d 328, 328-329 [1st Dept 1990], *affd for reasons stated* 77 NY2d 976 [1991]; *People v Welch*, 71 AD3d 1329, 1331 [3d Dept 2010], *lv denied* 15 NY3d 811 [2010]; *People v Lanza*, 299 AD2d 649, 650-651 [3d Dept 2002], *lv denied* 100 NY2d 540 [2003], *rearg denied* 100 NY2d 563 [2003]).

Such was the case here. The most troubling discrepancies in the record relate to the descriptions of the evidence in the voucher invoice and felony complaint. But Officer Lewis was responsible for both documents and was capably cross-examined by defendant. Officer Lewis identified the evidence as items recovered from defendant at the scene. He admitted that the felony complaint misdescribed those items.[3] He further explained that, when typing out the voucher invoice, his intent was to convey that the narcotics envelope contained "alleged crack cocaine" in two plastic bags with a combined weight of nine grams, which he measured by placing everything together on an uncalibrated scale. In contrast, criminologist Osorio testified that she weighed only the white substance in the larger of the two bags (*see Lanza*, 299 AD2d at 649-650; *People v Martinez*, 151 AD2d

---

[3] Officer Lewis averred in the felony complaint that he recovered "two (2) twist bags containing more than four ounces (4 oz) of cocaine." Four ounces is more than 20 times the amount Osorio determined the substance weighed and more than 12 times the amount Officer Lewis himself recorded as the combined weight of the evidence on the voucher invoice.

965, 965 [4th Dept 1989], *lv denied* 74 NY2d 814 [1989]). The photograph taken by

Officer Lewis corroborates both witnesses' trial testimony concerning the items included

in the narcotics envelope, and there was no gap in the custodial chain or evidence of

tampering between when Officer Lewis took the photograph and sealed the evidence, and

when Osorio took possession of that still-sealed package with its three unique identification

numbers.[4]

Defendant also focuses on Osorio's testimony that she did not "see" or write in her

worksheet that there were rips in the plastic bags recovered from defendant, which he

characterizes as irreconcilable with Officer Lin's testimony about the torn condition of the

larger bag. Defendant ignores that the bags were admitted into evidence at trial and the

factfinder was expressly encouraged to examine them to confirm Officer Lin's testimony.

If the larger bag *was* torn in some way, Osorio's mere failure to notice that defect would

not support an inference of tampering.[5] Because the bag is not part of the record on appeal,

---

[4] Although not clear from the record, it seems likely the felony complaint was executed
during this period, after the evidence had already been photographed and sealed.

[5] Contrary to the dissent's characterization of the testimony, the only bag that Osorio
affirmatively stated had no rips or holes in it was the plastic security envelope. Osorio's
primary role was to test the substance inside defendant's bags, not to examine their
condition. Moreover, although the dissent makes much of Officer Lin's statement that
"[e]verything started po[u]ring out" of the bag when defendant stomped on it and dragged
it across the ground, that lone statement does not support the dissent's assumption that the
bag could not have been handled in an office setting without threatening the "teaspoon" of
cocaine that remained, or that Osorio would have remembered the presence or absence of
rips two years after she tested the drugs inside. A physical examination of the bag, which
was available to the factfinder but not to this Court, could refute each of the dissent's
negative assumptions and, in the process, relieve it of having to speculate about what the
evidence showed.

it is impossible to discern the existence or extent of any discrepancy, let alone conclude that it rendered the *drugs* inadmissible.[6]

In making these points, we do not condone the seemingly careless manner in which the items were described, particularly in the official records. Imprecision and inaccuracy in police paperwork not only impede the prosecution of crime, they erode public confidence in law enforcement and lend credence to allegations of incompetence and misconduct. Nonetheless, it is a fundamental principle of our justice system that factfinders determine credibility and decide which inferences to draw from conflicting evidence, based on their direct examination of the physical evidence and observations of each witness's demeanor and tone (critical inputs unavailable to us on this appellate record). At the admissibility stage, the court's role is that of gatekeeper: the task is merely to assess whether the judge or jury, acting as factfinder, has been provided sufficient evidence to

---

[6] Other discrepancies highlighted by defendant and the dissent are overstated or have little to do with the minimal gap in the custodial chain. The varying descriptions of the cocaine as being in "rock" form, as a combination of rock and powder, or as "loose solid material," are all consistent with a substance that defendant partially crushed at the scene, as he was consistently described doing. There is no evidence that the substance changed in color or in some other immutable or inexplicable respect (*compare Montoya*, 244 AD2d at 510-511; *Espino*, 208 AD2d at 557; *Steiner*, 148 AD2d at 981-982). Officer Lin's testimony that she recovered "a plastic bag" and similar discrepancies regarding the number of bags recovered at the scene were explained by Officer Lewis's testimony that the smaller plastic bag and its 45 Ziploc packets were inside the larger plastic bag that fell from defendant's pocket. The isolated snippet of grand jury testimony in which Officer Lewis stated that he "recover[ed]" the evidence is not materially inconsistent with the officers' trial testimony or indicative of deceit; indeed, similar phrasing was used throughout trial. Nor is the fact that neither officer clearly explained who removed the evidence from the latex glove, or what happened to the latex glove after the evidence was vouchered, indicative of tampering. The glove was not itself evidence.

support a factual conclusion that the item in question is what the People claim (*see Julian*, 41 NY2d at 344). This Court, moreover, is jurisdictionally prohibited from making factual findings or engaging in weight of the evidence review. Our authority extends only to deciding questions of law[7] (*People v Bleakley*, 69 NY2d 490 [1987]).

In this case, a legally adequate foundation was provided by the People's chain of custody showing. Defendant's problem is not with the fact that the evidence was left overnight at a police station or with any risks specific to that gap, it is with the credibility of the People's witnesses and the purportedly insufficient weight accorded the discrepancies. It was within the province of the factfinder to attribute those discrepancies to "mistake, including faulty observation, recollection or recording" rather than to draw the more cynical inference of a conspiracy against defendant (*see People v Tavares*, 134 AD3d 436, 437 [1st Dept 2015], *lv denied* 26 NY3d 1150 [2016]; *People v Ciriaco*, 11 AD3d 324, 324 [1st Dept 2004]; *lv denied* 4 NY3d 742 [2004]; *People v Beverly*, 5 AD3d 862, 864-865 [3d Dept 2004], *lv denied* 2 NY3d 796 [2004]; *Matter of Kassan D.*, 287 AD2d

---

[7] The dissent goes far beyond mere impermissible weight of the evidence review, drawing negative inferences against the prosecution at every opportunity, questioning uncontested matters like the legality of the police stop, and relying on an informational source that does not qualify for judicial notice and did not exist at the time of trial, namely a Gothamist article discussing a vague and redacted document with a column that simply states "adverse credibility findings," on which Officer Lewis's name appears. While this information might have formed a basis for impeachment of Officer Lewis's credibility through cross-examination, it by no means constitutes record evidence warranting the dissent's apparent conclusion that Officer Lewis's testimony here was incredible as a matter of law. More generally, appellate judges should not presume that the inferences we draw from a cold record are more reliable than the conclusions of the factfinder who examined the physical evidence and observed the witness examinations.

564, 565 [2d Dept 2001]; *People v Cassells*, 254 AD2d 109, 109 [1st Dept 1998], *lv denied* 92 NY2d 981 [1998], *rearg denied* 92 NY2d 1029 [1998], *habeas denied* 2000 US Dist LEXIS 10327 [SD NY July 21, 2000]; *People v Figueroa*, 213 AD2d 343, 343 [1st Dept 1995], *lv denied* 86 NY2d 794 [1995]; *People v Padilla*, 175 AD2d 20, 20-21 [1st Dept 1991], *lv denied* 79 NY2d 830 [1991]; *People v Newman*, 129 AD2d 742, 742 [2d Dept 1987] [all treating explainable discrepancies in paperwork or testimony as raising issues of weight and credibility for the factfinder]).  The evidence was therefore properly admitted.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed.

RIVERA, J. (dissenting):

Defendant was convicted for drug possession and a traffic violation after police stopped him for allegedly driving while using his cell phone. At trial, the arresting officers could not explain why the bag of drugs they recovered—which was torn during the arrest so severely that the drugs were "po[u]ring out"—miraculously arrived at the crime laboratory for testing intact, transformed into a bag that the criminalist repeatedly

confirmed had no rips or holes. Nor could they explain how the items they found on defendant weighed over 20 times more than what the crime lab found. The nature and number of these discrepancies belie the majority's claims of a "brief" gap in the chain of custody showing and "logical explanations for the inconsistencies" in the arresting officers' testimony and the criminal laboratory's undisputed findings (*see* majority op at 7-8). On this record the prosecution failed to establish by clear and convincing evidence an unbroken, reliable chain of custody, that drugs were recovered from defendant, as charged.

The majority concedes that there are discrepancies in the chain of custody and acknowledges that the prosecution failed to fill these gaps, but attempts to make up for the missing links through speculation and obfuscation (*see* majority op 7, 9-10). Try as it might, the majority cannot explain away the lack of evidence regarding who, specifically, if anyone, was present and ensured the envelope was not handled when it was left in the precinct overnight, or how and why the contents of the evidence bag changed. By rewriting our law so that a chain of custody deficiency is now treated as a weight of the evidence problem, the majority disregards the judiciary's essential role as a gatekeeper on questions of admissibility in order to affirm a conviction obtained with questionable evidence. I dissent.

## I.

The prosecution must establish the foundation for evidence by clear and convincing evidence (*People v McGee*, 49 NY2d 48, 59-60 [1979]). "The offering party must establish, first, that the evidence is identical to that involved in the crime, and, second that it has not

been tampered with" (*People v Julian*, 41 NY2d 340, 342-343 [1977]). "[A] fungible item, such as a package of white powder, presents special difficulties in proving authenticity" (*id.* at 343). "If the object was taken from the defendant or found at the scene of the crime, the foundation is laid once it is shown that the thing offered is the one recovered and that its condition is substantially unchanged" (*People v Connelly*, 35 NY2d 171, 174 [1974]).

Here, there are so many material and troubling inconsistencies in the testimony regarding what the officers purportedly recovered from defendant that it's difficult to know which one to discuss first.[1] I'll start with the most critical and inexplicable discrepancy: the changing condition of the bag containing alleged drugs. One of the arresting officers, Officer Lin, testified that, during the arrest, the bag was ripped on the ground, where it left a white stain. She then "took out [her] latex glove" and "put [the bag] inside of the glove." Officer Lin explained she did this because "[t]he bag was broken. Everything started po[u]ring out." To be crystal clear: she confirmed that putting the bag in the glove was necessary *because* the bag was torn open. At the precinct, Officer Lin then placed that glove in an envelope, which the prosecution argued was the same envelope delivered to the crime lab for testing. However, the criminalist who opened the evidence package repeatedly testified that there were no rips or holes in any of the bags she received, including the bag that contained the tested substance. At trial, the criminalist further confirmed that the bags entered into evidence were in the same or substantially the same

---

[1] The third officer present at the stop of defendant's vehicle and during his arrest did not testify at trial, so my analysis is limited to the testimonies of Officers Lin and Lewis.

condition that she found them, and after reviewing the bag in evidence, she further testified that all of the bags she received—including the "plastic bags contained within" the security envelope—had no rips or holes. The prosecution did not provide any explanation on the record of how the ripped bag containing the drugs reached the crime lab undamaged.

Because the majority cannot rationally account for the self-mending bag, it instead questions the reliability of the criminalist by asserting that the criminalist's job was to test the substance, not the bag (*see* majority op at 9, n 5). This assertion is belied by the criminalist's testimony that her analysis includes "taking an inventory" of all the materials received in the bag and noting any discrepancies in those materials—not just the drugs themselves. She did that here and brought those discrepancies to the attention of her supervisor. The majority cannot avoid one more bit of testimony. Upon viewing the bag again and being questioned about it, the criminalist testified unequivocally that the bag she received had no rips or holes.

Next, and relatedly, is the mystery of the disappearing latex glove. Officer Lin testified she put the glove that contained the ripped drug bag in an unsealed envelope at the precinct, which she left unattended on a desk. Officer Lewis testified he recovered the envelope from that same spot at some later, undisclosed time, that it contained the glove and that he photographed the envelope's contents. But, as Officer Lewis admitted, the photograph does not depict the glove. And, the criminalist did not find a glove in the envelope sent to the lab. Officer Lewis's testimony that he removed the evidence from the glove before photographing it is incredible on its face because if the bag was ripped—as Officer Lin testified and which constituted the sole reason for putting the bag in the glove—

then removing the bag from the glove would have caused some or all of the substance to fall out, potentially destroying evidence.

Then, there are the inconsistent references to 45 glassine bags and conflicting testimony during different stages of this case regarding who recovered what from defendant when he was stopped. At trial, Officer Lin testified to retrieving the one ripped bag from the ground and putting it in the glove. She did not testify that she put anything other than that glove in the unsealed envelope that she left on the precinct table. But Officer Lewis testified before the grand jury that *he* recovered *two* clear bags containing *multiple* Ziploc bags that fell from defendant's pocket to the ground. Further, this grand jury testimony does not match the two arrest reports he filled out, where he stated that he personally recovered a single bag of crack cocaine and made no mention of another bag containing 45 glassine envelopes. The property voucher filled out by Officer Lewis likewise makes no mention of the glassine bags or a second plastic bag. During cross-examination at trial, Officer Lewis testified that it was Officer Lin who recovered the evidence, that there were two bags, and that one bag was inside the other. Given the officers' different versions of what they allegedly found on defendant, it is unclear who recovered what.

Another meaningful discrepancy in the evidence concerns the weight of the seized substance. Officer Lewis alleged in the felony complaint—the instrument charging defendant and the basis for his prosecution—that he recovered "two twist bags containing more than four ounces of cocaine." Four ounces is the equivalent of 113.39 grams. The property voucher he filled out states that there were two bags, each containing 9 grams of

crack cocaine. Officer Lewis explained that, although he listed a 9-gram bag of crack cocaine twice on the form, it was a duplicate, as opposed to referring to two separate bags. But that conflicts with the crime lab report which states that the tested substance weighed 5.53 grams. Officer Lewis attempted to explain this weight discrepancy as based on his use of a non-calibrated scale and that he weighed all of the items together. But, by these assessments, Officer Lewis recovered at least two teaspoons of cocaine from defendant while the lab found half that amount in one bag, all while the other bag contained 45 Ziploc bags and an unidentified residue, which could not explain the difference. And, even if we ignore this discrepancy, there is no explanation for the difference between these weights and the one listed in the felony complaint, which is over twenty-four times the weight of the drugs tested at the lab.

Lastly, there is uncertainty as to the integrity of the plastic glove Officer Lin first placed in an unsealed envelope which she then left on the desk in the precinct for an unknown period of time. There is no evidence as to who had access to the envelope before Officer Lewis retrieved it the morning after defendant's late-night arrest. Officers Lin and Lewis did not identify anyone charged with watching the envelope and neither officer testified about any protocol for safeguarding the envelope while it was out of their control or view. Indeed, the testimony makes clear that no action was taken to prevent tampering until hours after Officer Lin left it, when Officer Lewis eventually placed the unsealed envelope in a sealed package, vouchered it with a unique identification number, and then placed it in a narcotics safe for transportation by another officer to the crime lab. As the Court explained in *Connelly*, "the fact that the item was or might have been accessible to

other persons not called as witnesses casts suspicion on the integrity of the evidence often rendering it inadmissible especially when it appears that the evidence as available to unknown persons over an extended period" (35 NY2d at 175-176). While, in *Connelly*, the officers testified to "the identity and unchanged condition of the evidence," here we have testimony of the officers who collected, packaged, and vouchered the alleged drugs that contradicts the criminalist who received and tested the packaged substance, thus placing in question the integrity of the evidence (*id.* at 176).

The majority notes that almost, although not everyone, *known* to have handled the evidence testified at trial (*see* majority op at 6). But that begs the question whether someone else handled the envelope and its contents during the hours before Officer Lewis recovered it. There is no evidence of the name and rank of the person the majority assumes safeguarded the evidence, no evidence that Officer Lin notified anyone that there was evidence that needed to be safeguarded, and no evidence of how the unsealed envelope was in fact safeguarded. Thus, we cannot assume, as the majority does, that there is "no…evidence of tampering" (*see* majority op at 9).[2] The majority's effort to minimize the discrepancies falls flat because it matters that Officer Lewis could not get his story straight about what exactly was retrieved from defendant; it matters that there was no explanation for what happened to the glove that kept the drugs from "po[u]ring out" between the arrest and Officer Lewis's vouchering; it matters that 45 glassine packets appeared for

---

[2] Notwithstanding the majority's unwarranted assertions, I rely on the law as applied to the record before us, in contrast to the majority, which attempts to minimize the discrepancies by noting them in footnotes and by selectively drawing inferences favorable to the prosecution even though contradicted by the record evidence (*see* majority op at 11 n 7).

vouchering that were never mentioned in the arrest report or Officer Lin's testimony, as though she somehow would not notice fitting a bag with 45 bags into the latex glove; and it matters that the bag changed from a ripped to unripped condition.

These discrepancies lead to the inexorable conclusion that the prosecution failed to establish by clear and convincing evidence a chain of custody from the point of defendant's stop and arrest to the crime lab test, that laid a proper foundation "that the thing offered is the one recovered and [] its condition is substantially unchanged" (*id.* at 174).

## II.

The majority insists that, if the chain of custody is adequate and there are logical explanations for any inconsistencies, then "such discrepancies merely raise fact and credibility issues for the jury to resolve in assessing whether the People met their ultimate burden of establishing proof of guilt beyond reasonable doubt" (majority op at 8). This inverted analysis misses the mark. Proffered evidence of drugs allegedly recovered from a defendant is only admissible if it meets a threshold legal test that the chain of custody as described is unbroken and reasonably assures a court that the drugs offered for admission were actually retrieved, as charged by the prosecution (*Connelly*, 35 NY2d at 174; *Julian*, 41 NY2d at 342-343). Assurance of a reliable chain of custody provides the foundation for *admission* of the evidence, as a matter of law, not for assessing the weight assigned to it as a matter of fact or credibility. In other words, if the chain of custody does not connect the item retrieved at point A to the item at point B, we do not put evidence of the item at point B before the trier of fact.

The majority's string cites to Appellate Division cases that repeat well-established, general rules of evidence do not stand for a different proposition (*see* majority op. at 7, 11-12). While cases regarding a changed color or consistency of the proffered drug—say from white to brown powder, or from a powdery to a chunky substance—are qualitatively different from the type of discrepancies at issue on this appeal, they apply the controlling rule under *Connelly* and *McGee* to drug cases: If the prosecution fails to establish by clear and convincing evidence that the drug is the same one allegedly recovered from a defendant, then it is inadmissible (*see People v Montoya*, 244 AD2d 510, 511 [1997] [seized substance erroneously admitted when the prosecution never attempted to explain how the substance changed from powdery to chunky, or how it changed color]; *People v Espino*, 208 AD2d 556, 557 [1994] [same when chemist failed to provide explanation for how texture of cocaine changed from white powder to brownish white and hard]; *People v Steiner*, 144 AD2d at 980, 980 [4th Dept 1989] [same when the prosecution presented no testimony concerning whether it was possible for cocaine to change from powder to chunks and then back to powder again]; *People v Layou*, 71 AD3d 1382, 1383 [4th Dept 2010] [same when substances were left unattended in a police station room and then had "significant weight discrepancies" when analyzed at a crime lab]).

This same rule controls here, where the basis for doubting the connection of the substance to defendant is the change in the drug itself or the manner in which the drugs have been handled by law enforcement and the inconsistency in the conditions of the containers holding the substance between when they were first received and when they were eventually tested. If the drug is not identical or the drug or its packaging appears

tampered with suggesting it is not the same item, we do not put it to the factfinder to conclude that tainted evidence establishes the defendant's guilt. Before admitting such evidence, the court must be satisfied that there is clear and convincing evidence that the drugs proffered were recovered from defendant as described by the officers. If so, then the trier of fact can determine whether the drugs tested are the same as those allegedly recovered from defendant—a different matter from whether defendant was in fact knowingly possessing drugs for personal use or sale.

The chain of custody test safeguards individuals against wrongful convictions by ensuring that law enforcement follows adequate custodial procedures. Like the majority, I do not condone careless police work (*see* majority op at 10). But, I am unwilling to excuse it or disavow our judicial role of deciding whether there is clear and convincing evidence connecting the defendant to the items allegedly recovered at the scene by transforming a question of proper foundation for admission into a question of weight of the evidence.

We also should not ignore that Officer Lewis—the main witness for the prosecution connecting defendant to the drugs tested—is on the Queens District Attorney's list of officers with an "adverse credibility finding". That means a court or internal investigation questioned the officer's truthfulness in some other matter (*see Martinez v City of New York*, 2022 WL 17090267, at \*21 [ED NY Nov. 18, 2022, No. 16-CV-79 (NRM) (CLP)] [noting that, "In 2019, the Queens County District Attorney announced that her office had prepared and would maintain an internal list of 'substantiated misconduct allegations, criminal matters, adverse credibility findings and civil lawsuits' related to NYPD officers"]; *Officers with Classification Adverse Credibility Findings*, Queens County District

Attorney [print date 02/18/2021], *embedded at* George Joseph, *Queens DA Reveals New Internal List of NYPD Officers with Credibility Issues*, Gothamist [Feb. 16, 2021], https://gothamist.com/news/queens-prosecutors-tracked-nypd-cops-suspected-lying-and-criminal-convictions-documents-show [accessed Apr. 1, 2024] [document from the Queens DA released pursuant to New York's Freedom of Information Law including Officer Mark Lewis on list of officers with "adverse credibility findings"]). Here, Officer Lewis submitted different versions of events throughout the course of this prosecution concerning who recovered the substance at issue, how it was packaged, and how much the substance weighed. These shifting narratives should have alerted the court to problems with the reliability of the chain of custody and led to exclusion of the drug evidence. Indeed, defendant represented himself at the trial, and defendant impeached Officer Lewis regarding the grounds for the stop that precipitated the alleged recovery of drugs with evidence of defendant's own cell phone records. According to appellate counsel, those records show that defendant's phone had no outgoing or incoming calls or texts at the time of the stop, despite Officer Lewis's testimony that defendant had been on a phone call. Defendant also questioned the officer regarding allegations that he had planted evidence on two other individuals. This cross examination provided context for the court's assessment of the discrepancies in Officer Lewis's testimony and whether the prosecution's chain of custody evidence was reliable.

If the majority is going to affirm defendant's conviction for drug possession, it should do so based on clear and convincing evidence that the alleged substance and amount the officers say they recovered from defendant is actually what the crime lab received,

tested, and found to be a specified quantity of cocaine. No one's liberty should be taken on anything less than evidence of those links in the chain that connect a defendant to illegal drugs.

Order insofar as appealed from affirmed. Opinion by Judge Cannataro. Judges Garcia, Singas, Troutman and Halligan concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.

Decided April 25, 2024